Edward O. Provenzano, J.
Plaintiffs commenced this action in 1974 under section 1983 of title 42 of the United States Code (hereinafter called "section 1983”), commonly referred to as the Civil Rights Act of 1871. By order of Justice Patlow of this court, previously entered herein, plaintiffs were granted class action status pursuant to CPLR article 9, the class to consist of "all women inmates of the Monroe County Jail from February 1974 until the resolution of this action.”
Plaintiffs seek money damages, declaratory judgments, injunctive relief and attorneys’ fees. In their complaint they alleged that each of the above-titled defendants, acting separately and in concert, deprived members of the plaintiff class of various constitutional rights in respect to the following matters:
(a) failure to provide adequate medical treatment;
(b) inadequacy of medical facilities;
(c) restrictions on- incoming and outgoing mail;
(d) restrictions on receipt of books and publications;
(e) restrictions on visitation privileges;
(f) restrictions on use of telephones;
(g) improper conduct of disciplinary methods and proceedings;
(h) exclusion of women inmates from a particular vocational rehabilitation program;
(i) restrictions on use of the gymnasium and the exercise room;
(j) lack of paying jobs for women inmates;
(k) unsentenced inmates not allowed to participate in rehabilitation programs;
(l) undersize jail cells;
(m) overcrowded housing facilities and insufficient number of cells;
(n) denial of bail to indigent pretrial detainees.
By order of March 21, 1975 Justice Boehm of this court (1) *305 granted plaintiffs injunctive relief as to issues (d) and (g) (supra) and (2) granted them a trial preference in connection with issue (e) (supra) limited to determination of (i) whether any rational basis exists for distinguishing plaintiffs’ visiting rights from those of sentenced felons, and (ii) even if so, whether plaintiffs are nevertheless entitled to summary judgment on such issue (e) as a matter of law.
By order of April 13, 1976 based on a stipulation of counsel, Justice Erwin of this court dismissed all of plaintiffs’ claims as to issue (a) (supra) against each and all of the defendants. Such dismissal was contingent upon payment, by the defendant, County of Monroe, of $2,500 to the plaintiffs’ attorneys. (It appears that such payment was made on or about May 24, 1976.)
This case was assigned to me on April 13, 1976 for nonjury trial of all of the issues. The trial commenced on the following day. Prior to the receipt of evidence, the following proceedings took place:
(1) On joint motion of counsel, all causes of action against defendant, Frank P. Di Marsico, were dismissed;
(2) Plaintiff, Julia Glenn, having died, all causes of action on her behalf were dismissed on joint motion of counsel;
(3) The court took judicial notice of the prior order of Justice Wagner of this court, dismissing all causes of action on behalf of plaintiffs, Regina Cooper and Tracy Wright, pursuant to CPLR 3126 (subd 3);
(4) The court reserved decision on the motion of defense counsel to dismiss, on the face of the complaint, the causes of action pleaded against defendants, Morin, Lombard and Stan-wick in their individual capacities. The court now denies the said motion as to each of the said three defendants.
Before the plaintiffs rested their case, the court signed a consent order (on April 21, 1976) which effectively removed issue (b) (supra) from the lawsuit.
At the close of their case, Plaintiffs moved pursuant to CPLR 3025 (subd [c]) to amend the complaint to conform to the proof so to state additional causes of action in respect to the following matters:
(o) violation of Judge Boehm’s aforesaid injunctive order of March 21, 1975 [plaintiffs here seeking a judicial declaration to that effect];
(p) restrictions on use of personal stationery;
*306 (q) restrictions on access to counsel;
(r) invalidity of regulations regarding punishment of inmates for infractions;
(s) failure to furnish inmates with personal hygiene items;
(t) lack of proper classification systems;
(u) undersize jail cells.
Having previously reserved decision on those motions to amend and add, the court decides them now.
As to issue (o), the motion is denied. Plaintiffs’ counsel stated that the motion was based on "substantial evidence to show willful violation of a court order”. Declaratory judgment to that effect would amount to an adjudication of defendants’ contempt without proof of prerequisite statutory service (see CPLR 5104). Addition of such a cause of action would require an amended answer bringing into play defenses within the Judiciary Law processes which defendants were unprepared to meet under the original pleadings. The same proof which plaintiffs would offer to support issue (o) would already entitle them, within the original pleadings, to possible declaratory relief and possible compensatory and punitive damages. (See Smith v Losee, 485 F2d 334, cert den 417 US 908; Caperci v Huntoon, 397 F2d 799, cert den 393 US 940.)
As to issues (p) through (t) (supra) the motions to amend and add are granted. The defendants had ample opportunity to meet and litigate these matters within the framework of the issues originally pleaded.
As to issue (u) (supra) the court denies the motion on the ground that it was already pleaded (see issue [1], supra), through paragraph 40 of the complaint, in the "Ninth” denominated cause of action. This issue was also pleaded in the complaint’s "Tenth” denominated cause of action. Plaintiffs pleaded parallel causes of action throughout the complaint, alleging violations of both the United States Constitution and the Constitution of the State of New York. The court does not propose to adjudicate the claims of violations of the State Constitution for the following reasons: (1) on page one of their brief, plaintiffs’ counsel stated that the action was brought pursuant to section 1983; (2) liability under section 1983 is predicated solely on the violation of rights secured under the Federal Constitution (Paul v Davis, 424, US 693; Rizzo v Goode, 423 US 362; Zwickler v Koota, 389 US 241) and not on rights arising under the State laws (Association For Preserva *307 tion of Freedom of Choice v Simon, 299 F2d 212; Ortega v Ragen, 216 F2d 561, cert den 349 US 940); (3) dual recovery is barred (Brody v Leamy, 90 Misc 2d 1, 10-12) and (4) plaintiffs have pointed to no relief available to them (and the court is aware of none), as a consequence of violation of State constitutional rights, which they could not obtain under section 1983 as a consequence of violation of Federal constitutional rights.
At this time, the court on its own motion is going to deem the complaint amended to add two further causes of action, in respect to the following matters:
(v) lack of outdoor exercise;
(w) cells neither having windows nor facing windows.
The court finds it proper that the complaint be so amended, even though plaintiffs made no motions therefor, since these matters were raised in the proof, were actually litigated by the parties and were within the broad framework of the original pleadings. (See Tollin v Elleby, 77 Misc 2d 708; Purfield v Kathrane, 73 Misc 2d 194; Helman v Dixon, 71 Misc 2d 1057 [citing authorities]; see also CPLR 3017 subd [a].)
On joint motion of counsel, prior to the presentation of defendants’ evidence, all causes of action against defendant, Lucien Morin, in his individual capacity were dismissed. The trial was concluded on April 30, 1976 at which time the court, together with counsel for the parties, toured the facilities of the Monroe County Jail, including the adjunctive women’s section thereof.
The stenographic transcript of the trial testimony was delivered to the court in October 1976. Following submission of briefs, change of personnel in the Monroe County Attorney’s office and numerous requests by counsel for extensions of time to submit additional authorities, the matter was finally submitted to the court on February 24, 1977.
Reaching the court’s present determinations required the examination of literally thousands of pages of testimony and other documentary evidence, hundreds of reported case authorities, dozens of statutes and regulations and numerous reports, articles, surveys, texts and manuals. Plaintiffs’ counsel alone cited over 120 cases for the court’s consideration.
DISMISSAL OF THE ACTION AGAINST DEFENDANT MORIN
To hold a defendant liable under section 1983, whether for money damages or for equitable relief, it must be shown that *308 he had individual and personal knowledge of, or affirmatively participated in, conduct constituting deprivation of a plaintiffs constitutional rights. (Rizzo v Goode, 423 US 362, supra; United States ex rel. Bennett v Prasse, 408 F Supp 988; Fitchette v Collins, 402 F Supp 147; Waltenberg v New York City Dept. of Correction, 376 F Supp 41.) Plaintiffs here have wholly failed to sustain that burden as against the defendant, Lucien Morin. The evidence adduced at trial failed to show that Mr. Morin was personally aware of, or affirmatively participated in, any of the matters alleged by plaintiffs as constitutional deprivations. The complaint is therefore dismissed, in its entirety, as against the defendant, Morin, in his official capacity.
DISMISSAL OF THE ACTION AGAINST DEFENDANT COUNTY OF MONROE
Liability under section 1983 is asserted against every person who, under color of State law, subjects another to the deprivation of any constitutional rights. A county, municipal corporation or other subdivision of State government is not a "person” within the meaning of section 1983, either for purposes of legal relief or equitable relief. (Aldinger v Howard, 427 US 1; City of Kenosha v Bruno, 412 US 507; Moor v County of Alameda, 411 US 693; Monroe v Pape, 365 US 167.)
It appears from City of Kenosha v Bruno (supra) that the question is jurisdictional, that the court lacks jurisdiction to grant any relief under section 1983 as against the defendant, County of Monroe, and that it is incumbent upon the court to raise this issue on its own motion even though none of the parties has questioned the court’s jurisdiction over said defendant. (See City of Kenosha v Bruno, supra, pp 511-513; cf. Moore v Buckles, 404 F Supp 1382; Brause v 2968 Third Ave., 41 Misc 2d 348, 353, affd 43 Misc 2d 691.)
Neither could the county be found derivatively liable through one of the other defendants. (See Moor v County of Alameda, 411 US 693, supra; Reeves v City of Jackson, Miss., 532 F2d 491.)
Nor is the doctrine of respondeat superior applicable in actions brought under section 1983. (Navarette v Enomoto, 536 F2d 277; Draeger v Grand Cent., 504 F2d 142; Johnson v Glick, 481 F2d 1028, cert den 414 US 1033; Jennings v Davis, 476 F2d 1271; Adams v Pate, 445 F2d 105.)
*309 It should also be noted that members of the Monroe County Legislature would be immune from liability under section 1983. (See Tenney v Brandhove, 341 US 367; Gillibeau v City of Richmond, 417 F2d 426; Shellburne v New Castle County, 293 F Supp 237.)
The court recognizes that certain proceedings have already taken place herein (re Justice Erwin’s order of April 13, 1976 and my order of April 21, 1976) affecting the County of Monroe as a party defendant before the jurisdictional issue was discovered by the court’s own research. The court deems it unnecessary at this stage to consider the effect, if any, of the jurisdictional question on such prior proceedings. The complaint is hereby dismissed, in its entirety, as against the defendant, County of Monroe.
RECAPITULATION
The remaining parties plaintiff are Carol Ann Lewin, Doris McNair, Elaine Reed and all women inmates (except Regina Cooper, Julia Glenn and Tracy Wright) of the Monroe County Jail from February 1974 to the time of final judgment herein.
The remaining parties defendant are William Lombard and Robert Stanwick, both in their individual and official capacities.
The remaining issues are alleged violations of constitutional rights in respect to the matters denominated (supra) as (c), (d), (e), (f), (g), (h), (i), (j), (k), (1), (m), (n), (p), (q), (r), (s), (t), (v) and (w).
Plaintiffs’ rights to relief, if any, must be determined against the backdrop of recurrent legal considerations and pertinent factual considerations, which are here set forth, by letter designation, for "reference back” in discussion of the various issues.
LEGAL CONSIDERATIONS
(A) Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. (Pell v Procunier, 417 US 817; Price v Johnston, 334 US 266.) Thus, e.g., due process does not render the Sixth Amendment rights to counsel and to confrontation of witnesses, or the Fifth Amendment protection against self incrimination, applicable in prison disciplinary proceedings. (Baxter v Palmi *310 giano, 425 US 308; Wolff v McDonnell, 418 US 539.) Nor will the First Amendment guarantee of freedom of speech prevent the inspection or reasonable censorship of an inmate’s mail by his custodians, (Wolff v McDonnell, supra; Procunier v Martinez, 416 US 396) or entitle him to personal visitation by a member of the news media, where other lines of communication are not closed to the inmate (Pell v Procunier, supra).
(B) The Supreme Court still recognizes the viability of the traditional "hands off” approach of the courts toward problems of prison administration. (See Jones v North Carolina Prisoners’ Labor Union, 433 US 49, 126; Procunier v Martinez, supra, p 404.)
"Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government * * * courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. They are also ill suited to act as the front-line agencies for the consideration and resolution of the infinite variety of prisoner complaints.” (Procunier v Martinez, supra, pp 404-405.)
"Of necessity, rules far different than those imposed on society at large must prevail within prison walls. The federal courts, as we have often noted, are not equipped by experience or otherwise to 'second guess’ the decisions of state legislatures and administrators in this sensitive area except in the most extraordinary circumstances. This recognition * * * 'reflects no more than a healthy sense of realism’ on our part to understand that needed reforms in the area of prison administration must come, not from the federal courts, but from those with the most expertise in this field — prison administrators themselves.” (Burger, Ch. J., concurring in Jones v North Carolina Prisoners’ Union, supra, p 136.)
(C) But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims. When an institutional regulation or practice offends a fundamental constitutional guarantee, the courts will discharge their duty to protect constitutional rights. (Procunier v Martinez, supra, 405-406.)
(D) The cost of protecting a constitutional right cannot *311 justify its total denial. (Bounds v Smith, 430 US 816.)
(E) A prisoner is not wholly stripped of his constitutional or civil rights during and because of his incarceration. (Wolff v McDonnell, supra; Jackson v Bishop, 404 F2d 571, 576.) Subject to restrictions imposed by the nature of the regime to which he has been lawfully committed, he retains such rights as may be mutually accommodated between institutional needs and objectives and the provisions of the Constitution that are of general application. (Wolff v McDonnell, supra, p 556.) Among the constitutional rights which thus attach to persons in custody are:
(1) The First Amendment right to freedom of speech. (Pell v Procunier, 417 US 817, supra; Procunier v Martinez, supra.)
(2) The First Amendment right to freedom of religion. (Cruz v Beto, 405 US 319.)
(3) The Sixth Amendment right to assistance of counsel — for prisoners awaiting trial. (Mosley v Dutton, 367 F2d 913, cert den 387 US 942.)
(4) The Eighth Amendment prohibition against cruel and unusual punishment. (Estelle v Gamble, 429 US 97; Weems v United States, 217 US 349; McCray v Sullivan, 509 F2d 1332, cert den 423 US 859.)
(5) The Fourteenth Amendment right to equal protection of the laws. (Lee v Washington, 390 US 333; Smith v Bennett, 365 US 708.)
(6) The Fourteenth Amendment right to due process of law. (Bounds v Smith, supra; Wolff v McDonnell, 418 US 539, supra; Johnson v Avery 393 US 483.) The Supreme Court has also found, under the due process clause, a constitutional right of "access to the courts” — to challenge unlawful convictions or unlawful incarceration (see Bounds v Smith, supra; Procunier v Martinez, 416 US 396, supra; Johnson v Avery, supra) which includes the right to assistance of counsel (Procunier v Martinez, supra) and the alternative right of access to a law library (Bounds v Smith, supra).
(F) Cruel and Unusual Punishment — It should be kept in mind that conditions must be "barbarous” or "shocking to the conscience” before they can be termed cruel and unusual punishment. (Wilkinson v Skinner, 34 NY2d 53, 60; see, likewise, Novak v Beto, 453 F2d 661, 671.)
(G) Equal Protection of Laws — The Fourteenth Amendment *312 does not secure the same laws and remedies either in different States or throughout the same State, but only that all persons shall be given the same protection of laws enjoyed by others in the same place and under like circumstances. (Missouri v Lewis, 101 US 22, 31.) Territorial uniformity within a State is not a constitutional prerequisite under the equal protection clause. (McGowan v Maryland, 366 US 420, 427; Matter of Rosenthal v Hartnett, 36 NY2d 269, 274.)
Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. (Baxstrom v Herold, 383 US 107, 112.) The test is whether differentiation in classification or treatment bears some rational relationship to a legitimate State purpose. If any grounds can be conceived to justify the differentiation, no violation of equal protection will be found. (Mogle v Sevier County School Dist., 540 F2d 478.)
Courts cannot undertake to review every official action taken against a prisoner which results in that prisoner being treated differently from any other prisoner. (Beatham v Manson, 369 F Supp 783, 790; see Makal v State of Arizona, 544 F2d 1030, 1035, finding no equal protection violation where convicted persons received credit for all time spent in custody while those committed for mental illness received none; see, also, Hill v Estelle, 537 F2d 214, length-of-hair regulations enforced against male inmates but not against female inmates; female inmates permitted to call home once every 60 days, male inmates permitted no outgoing phone calls; only the female inmates allowed to decorate their cells — held: "The regulations impinge on no fundamental right and create no suspect classification.”)
In Wilkinson v Skinner (supra) our Court of Appeals, addressing the complaint of a pretrial detainee at the Monroe County Jail, said (p 62): "We would but observe that a prison cannot be run * * * as a fledgling democracy.”
(H) Section 1983 imposes liability only for deprivations or violations of clearly established Federal constitutional rights of a particular plaintiff. (Wood v Strickland, 420 US 308, 322; Morris v Travisono, 528 F2d 856, 858.)
(I) As Mr. Justice Powell pointed out (p 329), dissenting in Wood v Strickland (supra), a 5-4 decision, there is often considerable disagreement, even among constitutional law scholars, as to what are "clearly established” constitutional *313 rights: "One need only look to the decisions of this Court — to our reversals, our recognition of evolving concepts, and our five-to-four splits — to recognize the hazard of even informed prophecy as to what are 'unquestioned constitutional rights.’ ”
(J) Constitutional Limitations on Injunctive Relief — This court possesses no taxing power and, under the doctrine of separation of powers, is not constitutionally empowered to order the expenditure of public funds, either for the construction of new jail facilities or for the renovation of existing ones. (See Matter of Smiley, 36 NY2d 433, 439; Detainees of Brooklyn House of Detention for Men v Malcolm, 520 F2d 392, 399; Padgett v Stein, 406 F Supp 287, 303; Jones v Wittenberg, 330 F Supp 707, 712-713.) Nevertheless, the court can order the release of persons held under conditions which deprive them of rights guaranteed by the Constitution unless such conditions are corrected within a reasonable time. (Detainees of Brooklyn House of Detention for Men v Malcolm, supra; Padgett v Stein, supra.) The court can also direct the defendants, where possible, to reallocate the funds within their control to alleviate unconstitutional conditions. (See Jones v Wittenberg, supra.) Of course, injunctive relief speaks to present, not past, conditions. (Rizzo v Goode, 423 US 362, supra.)
(K) Judicial Notice — Judicial notice may be taken by any court at any stage of the litigation, even on appeal. (Associated Gen. Contrs. of Amer., N. Y. State Ch. v Lapardo Bros. Excavating Contrs., 43 Misc 2d 825; Tuffarella v Erie R. R. Co., 33 Misc 2d 1040.) Judicial notice may be taken of conditions of other prisons. (Dillard v Pitchess, 399 F Supp 1225, 1235.) The court may judicially notice the rules and regulations of the New York State Commission of Correction. (CPLR 4511, subd [b]; see Christman v Skinner, 468 F2d 723, 726; see also Wilkinson v Skinner, 34 NY2d 53, 63, n 7.)
(L) Officials whose functions necessarily involve the exercise of discretion are entitled to rely on traditional sources for the factual information on which they decide and act. (Wood v Strickland, 420 US 308, 319; Scheuer v Rhodes, 416 US 232, 246.) Unreasonable ignorance of a plaintiffs constitutional rights will not, however, excuse a defendant official from liability under section 1983. (Wood v Strickland, supra.)
(M) Where jail officials have acted pursuant to a State code of rules and regulations, and such rules and regulations were not theretofore declared unconstitutional, and there is no allegation of malicious action or wanton disregard of a plain *314 tiffs rights, such officials are protected, in a section 1983 suit for damages, by a qualified privilege. (Christman v Skinner, 468 F2d 723, 725-726; Nelson v Knox, 256 F2d 312, 315.)
(N) This court has no supervisory powers over the Monroe County Jail or its officials. Therefore, plaintiffs’ claims must stand or fall solely on whether they have stated and proved deprivations, by the remaining defendants, of established constitutional rights, and not on what this court might or might not think is the best or the better practice. (Collins v Schoonfield, 344 F Supp 257, 265.) As our Court of Appeals observed, in Wilkinson v Skinner (34 NY2d 53, 62, supra): "We may disagree with many of the actions taken by detention officials. But it is not up to this court to choose from conflicting penal sociological theories. Even detention officials’ activities which are universally condenmed will not be terminated by this court if they do not transgress some law or pertinent rule or regulation. The role of the courts is not to put a stop to practices that are unwise, only to practices that are unconstitutional or illegal.”
(O) Prisoners awaiting trial may be constitutionally incarcerated under the same conditions as those already convicted, where justified by considerations of institutional order, health, safety, security, discipline and population turnover. (See, e.g., Padgett v Stein, 406 F Supp 287, 295-296, supra; Tyrrell v Taylor, 394 F Supp 9, 19, affd 535 F2d 823; Collins v Schoonfield, supra; People v Von Diezelski, 78 Misc 2d 69, 75-76.)
It appears that more than 90% of the present plaintiff class are pretrial detainees. (See [II], infra.) These plaintiffs argue that they are innocent people who are confined solely because they are poor. As such, they claim they are entitled to all of the rights of ordinary citizens, except the right to go and come as they please, and that the conditions of their incarceration must be the least restrictive means necessary to justify depriving them of their liberty. They cite an impressive array of cases to support these claims. (See, esp, Rhem v Malcolm, 507 F2d 333, 336-337.)
The court has examined plaintiffs’ authorities as well as several others which do not express quite such liberal views. (See Wilkinson v Skinner, supra; Rigney v Hendrick, 355 F2d 710; Padgett v Stein, supra; Tyrrell v Taylor, supra; Collins v Schoonfield, supra; Morris v Crumlish, 239 F Supp 498, affd 355 F2d 710; see also [A], supra.)
Rigney v Hendrick (supra, p 715) rejected (as too "broad”) *315 the assertion that a State’s constitutional authority to distinguish between pretrial detainees and pretrial bailees furnishes no justification for any additional inequality of treatment beyond that inherent in the confinement itself.
Tyrrell v Taylor (supra) rejected the "presumption of innocence” standard as a constitutional foundation for the rights of pretrial detainees, citing (p 18) the following language of the District of Columbia Court of Appeals, in Blunt v United States (322 A2d 579, 584): "The presumption of innocence, however, has never been applied to situations other than the trial itself. To apply it to the pretrial bond situation would make any detention for inability to meet conditions of release unconstitutional.”
On the record before it, the Tyrrell court chose not to reach equal protection or due process issues, but stated, (p 19, n 30): "On the one hand, the pretrial detainee is, by the nature of his status, not equal to a person on bail. One is imprisoned; the other is not * * * On the other hand, holding that the rights of a pretrial detainee must be equal to those of a convicted prisoner forecloses the possibility that the rights of the former should be greater than those of the latter.”
One scholar, tracing the roots of the "presumption of innocence” concept, has observed that neither the Constitution itself nor an examination of historical precedents justifies courts treating it as a general provision of constitutional rank. It is not in fact a real presumption, or any other legal term, she says, but (agreeing with Wigmpre) is instead merely a rephrasing of the prosecution’s trial obligation of proving guilt. The writer notes that the claim has been made that pretrial detention abridges the "presumption of innocence which is supposed to be included in the guarantee of due process”. "The easiest way to refute such an assertion,” she says, "is to point out that there has always been pretrial detention in capital cases, and that no one has ever seriously maintained that this violated due process of law”. (Meyer, pp 1438-1449 [see Appendix, infra].)
All sorts of people are active in attempting to effect the release of members of the plaintiff class, even their custodians. The court judicially notes the activity of an effective pretrial release program in Monroe County. Most female pretrial detainees are released from custody within the first two days; less than one in five is held longer than 10 days. (See [KK], infra.) As to the latter, it is not a simple case of presumed *316 indigent innocence. Many are accused of murder or other serious felonies. (See [JJ], infra.) All have been accused of their crimes by witnesses under oath, before a Magistrate or a Grand Jury or both. In setting bail, if any, the committing Judges were required to consider, inter alia, such factors as prior criminal record, probability of conviction and, especially, likelihood of flight prior to trial. (See CPL 510.30.) While maximum security is generally not required for sentenced misdemeanants, it is recognized as appropriate in a pretrial detention facility. (Croft, pp 2-3 [see Appendix, infra]; Yale, p 955 [Appendix, infra].) "A pretrial detainee constitutionally need not and, as a practical matter, cannot be provided with a normal civilian life while incarcerated awaiting trial. Before being held as a pretrial detainee, the individual has been arrested on probable cause and the judiciary has determined that there exists a prima facie case against him. Moreover, since the detainee was not released on his own recognizance, the requirement of bail indicates a concern for whether the pretrial detainee will appear at his trial and/or his probable dangerousness to the community. Hence, the pretrial detainee is lawfully imprisoned. Thus, while there are differences in the rights enjoyed by pretrial detainees as opposed to convicted prisoners, lawful imprisonment by its nature requires a dilution of the rights and privileges normally enjoyed by the general public outside the prison walls [Citing authorities]”. (Padgett v Stein, 406 F Supp 287, 295, supra.)
Especially on the facts of the present case (see [AA] through [VV], infra), I am in accord with the views of Chief Judge Sheridan, in Padgett v Stein (supra). The United States Supreme Court has not held to the contrary. Nor do I believe it will. (See [P] [1], infra.)
(P) Plaintiffs’ counsel have cited a plethora of Federal cases purportedly supporting their claims of constitutional deprivations. Most of those cases do support plaintiffs’ positions; some merely appear to do so; many do not at all (e.g., see the court’s discussions, infra; re issues [j] and [r]). Some of plaintiffs’ authorities take constitutional positions contrary to, or different from, what appears in this memorandum decision. As to those, the court observes as follows:
(1) Constitutional rights actionable (by prisoners) under section 1983 are necessarily what the United States Supreme Court so holds, and not necessarily what lower Federal courts (even the Circuit Courts) so hold. (See, e.g. [reversing Federal *317 court holdings under § 1983], Jones v North Carolina Prisoners’ Labor Union, 433 US 49, supra; Meachum v Fano, 427 US 215; Baxter v Palmigiano, 425 US 308, supra; Wolff v McDonnell, 418 US 539, supra; Pell v Procunier, 417 US 817, supra; Preiser v Rodriguez, 411 US 475.)
(2) The construction given by Federal courts to Federal law, including the Constitution, is entitled to "due and great respect” in the State courts, but the latter are not strictly bound in such matters by any but the United States Supreme Court decisions. (See People ex rel. Ray v Martin, 294 NY 61, 73, affd 326 US 496; Myer v Shields & Co., 25 AD2d 126; New York Cent. R. R. Co. v Lefkowitz, 46 Misc 2d 68, mod 28 AD2d 735, affd 23 NY2d 1; State v Coleman, 46 NJ 16, cert den 383 US 950 [citing authorities].)
"In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court.” (State v Coleman, supra, p 36.)
Note is taken of Rhem v Malcolm (371 F Supp 594, affd 507 F2d 333, supra) cited more than 25 times by plaintiffs in their posttrial brief. Although not the seminal case in the area of prisoners’ civil rights, Rhem has been followed (in one respect or another) in several other cases which plaintiffs also urge on the court as authority. The plaintiff class in Rhem consisted entirely of pretrial detainees at the Manhattan House of Detention (known popularly as "the Tombs”). The plaintiffs there alleged that numerous aspects of the conditions of their confinement violated constitutional requirements of due process and equal protection and constituted cruel and unusual punishment. Judge Lasker in the District Court found for the plaintiffs in all respects and the Second Circuit affirmed (as to findings of unconstitutionality). At least two courts have interpreted Rhem as a holding that the "totality” or "cumulative effect” of conditions at the Tombs constituted cruel and unusual punishment. (See McNulty v Chinlund, 89 Misc 2d 713, 715-716; Padgett v Stein, 406 F Supp 287, 293, supra.) In his opinion, however, Judge Lasker appeared to make several individual findings of unconstitutionality. In the area of disciplinary proceedings, he held (p 632) that the plaintiffs were constitutionally entitled to cross-examination of adverse wit *318 nesses and to a limited right to counsel. The Supreme Court, however, has since rejected such holdings. (Baxter v Palmigiano, 425 US 308, supra.) As will be seen (infra) this court also differs with Judge Lasker, in certain other respects, as to what are and what are not constitutionally protected rights within the present lawsuit. The "bottom line” of the Rhem litigation, and the court-ordered relief there, is that the Tombs has been closed and inmates formerly housed there are now detained at a facility on Riker’s Island, substantially less accessible to the courts and to friends, family and attorneys (one Legal Aid Society lawyer stating that it once took him over 2½ hours to reach Riker’s Island from Manhattan — see 42 Brooklyn L Rev 932, 950, n 119.)
(3) The mere existence of conflicting authorities militates against findings that rights alleged are established constitutional rights.
(4) Apropos here in what my colleague, Justice Boehm, wrote in Powlowski v Wullich (81 Misc 2d 895, 903): "The plaintiffs have submitted a multitude of cases to support the granting of all of their demands * * * The fact that other courts may have granted such relief with respect to other institutions is not controlling. Their decisions may have depended on factors not present here, or different procedural requirements, or simply the manner in which a Judge exercised his discretion.”
(Q) The "Defense” of "Good-Faith Immunity” — Stating that the Civil Rights Act should be read against the backdrop of tort liability that makes one responsible for the natural consequences of his actions, the Supreme Court has made it clear that a public official will not be liable in damages under section 1983 unless (1) he knew or should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, or (2) he took the action with the malicious intention of causing a deprivation of constitutional rights or other injury to the plaintiff. (See O’Connor v Donaldson, 422 US 563; Wood v Strickland, 420 US 308, supra; Scheuer v Rhodes, 416 US 232, supra; Pierson v Ray, 386 US 547; Monroe v Pape, 365 US 167, supra.) Pierson addressed the good-faith concept as a "defense” but the later cases have discussed it in terms of a qualified "immunity”.
Following the lead of the Supreme Court, many Federal courts have applied the good-faith theory to the potential *319 liability of officials having custody of prisoners. Frequently the concept is phrased in terms of "defense of good-faith immunity”. The area of disagreement among the lower courts is whether good faith is (a) an affirmative defense which must be both pleaded and proved (see United States ex rel. Tyrrell v Speaker, 535 F2d 823; Fidtler v Rundle, 497 F2d 794) or (b) an affirmative defense which must be proved (see McCray v Burrell, 516 F2d 357; Smith v Losee, 485 F2d 334; McLaughlin v Tilendis, 398 F2d 287) or (c) a presumption which must be overcome by plaintiffs evidence of bad faith (see Morris v Travisono, 528 F2d 856, supra; Lane v Inman, 509 F2d 184; Schrank v Bliss, 412 F Supp 28; Collins v Bordenkircher, 403 F Supp 820). Bryan v Jones (530 F2d 1210) appears to hover somewhere between (b) and (c). (See also Knell v Bensinger, 522 F2d 720; Giampetruzzi v Malcolm, 406 F Supp 836.)
Plaintiffs having chosen their forum in this State court, the New York procedural provisions are generally applicable to the action. (See Holt v City of Troy, 78 Misc 2d 9; Brown v Pitchess, 112 Cal Rptr 350.) Defendants here did not plead a defense of good faith. If it is in fact an affirmative defense, CPLR 3018 (subd [b]) might preclude defendants from availing themselves of such defense at this time. Two Federal cases are noted at this point. Qualls v Parrish (534 F2d 690) held that Federal, not State, law applies and determines the adequacy of defenses asserted in an action under section 1983. Anthony v White (376 F Supp 567, 572, n 4) stated: "While common law tort principles determine which defenses are available in section 1983 actions, the controlling body of common law doctrine is not necessarily that of the forum state but rather common law doctrine generally or what the Supreme Court has termed 'the prevailing view (of tort law) in this county.’ ”
In Pierson v Ray (386 US 547, supra) the Supreme Court apparently found the defense of good faith available even where it had been neither pleaded nor specifically raised by the defense. Said the court (p 557): "We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under #1983 * * * The officers did not defend on the theory that they believed in good faith that it was constitutional to arrest the ministers solely for using the waiting room. Rather, they claimed and attempted to prove that they did not arrest the ministers for the purpose of preserving the *320 custom of segregation in Mississippi, but solely for the purpose of preventing violence * * * If the jury believed the testimony of the officers and disbelieved that of the ministers, and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional. ” (Emphasis mine.)
On the basis of the foregoing authorities, I hold that good faith is a defense which need not have been affirmatively pleaded in this action. Defendants, however, bear the burden of its proof, and may avail themselves of the defense only if and where it is supported by the evidence. The court notes that plaintiffs’ counsel acknowledged the availability of a good faith defense here. Of course, the defense of good faith need become an issue only where a violation of civil rights has been established. (Fidtler v Rundle, supra, p 802.) Good faith is not a defense which, even if established, would prevent the court from granting equitable relief. (See Mattis v Schnarr, 502 F2d 588.)
FACTUAL CONSIDERATIONS
This portion of the court’s opinion includes selected findings of fact and matters judicially noticed (see Appendix, infra).
(AA) The Monroe County Jail occupies about 55% of the space in the Monroe County Public Safety Building. It is a relatively new and modern detention facility, construction of which was completed, and occupancy commenced, in April 1971. It was built to replace the former antiquated and inadequate county jail on Exchange Street in Rochester. It was designed as a facility for persons (1) awaiting court action, or (2) committed as witnesses in criminal cases, or (3) committed for contempt of court or (4) committed for civil offenses. Subsequent actions by county authorities also resulted in the closing of the ancient and thoroughly inadequate former county penitentiary on South Avenue in Rochester and the transfer, in the fall of 1971, of that facility’s sentenced prisoners to the new county jail. That transfer had not earlier been planned, and was reportedly made "at least on an interim basis”. The newly-combined operations, however, dictated that the entire fourth floor and the fourth-floor mezzanine, half of which was intended for housing of female prisoners, be fully utilized for the detention of male prisoners. To provide detention for the thus-displaced female prisoners (prearraigned, *321 pretrial and sentenced), the county contracted with the City of Rochester to convert and use existing lockup facilities on the third floor of the abutting City Public Safety Building. Layout and equipment modifications were made to the city facility to provide supportive services and direct physical access to and from the jail proper. This resulted in what a State Correction Commission inspector described as "a valuable adjunctive facility to the new County Jail.” The new female detention area did not, however, provide all of the safety and security features and cell space requirements of regulations of the State Commission of Correction which were then in effect. Nevertheless, on December 16, 1971 the commission approved use of this facility for confinement of all female prisoners on a continued temporary basis "pending satisfactory operation over an extended period of time and its capacity to consistently provide suitable housing and supportive areas for detention of female prisoners”. The facilities thus provided for the female prisoners consisted, chiefly, of 24 single-occupancy cells, two "corridor” isolation cells and two day rooms. (Walsh [see Appendix, infra]; Croft, pp 2-9 [see Appendix, infra].)
(BB) The said temporary basis has now continued for over 5V2 years. All female prisoners are still jailed in that same "adjunctive facility”. The parties stipulated that (a) the 24 single-occupancy cells are 37 square feet in area, (b) the two corridor cells are 60 square feet apiece, (c) the day room for sentenced women is 315 square feet, and (d) the day room for unsentenced women is 240 square feet.
(CC) Both the Monroe County Jail proper and the adjunctive female detention section are maximum-security facilities. (Croft, p 1 [see Appendix, infra].)
(DD) As part of its aforesaid contract with the city (see [AA], supra), the county also converted, and modified to the jail use, existing lockup facilities on the second floor of the abutting City Public Safety Building. That conversion provided the county jail with 46 additional cells for the housing, on an overflow basis, of sentenced male prisoners. As with the female detention area on the floor above, however, the converted lockup facilities for male prisoners did not meet all the requirements of the State Commission. Nevertheless, the commission "somewhat reluctantly” gave its approval with the understanding that if administrative difficulties arose subsequently, because of restrictions in safety, security and space requirements, "it will be a county responsibility to take imme *322 diate corrective steps”. No evidence was introduced as to the size of these 46 cells. However, from my observations during the tour of the jail and my prior familiarity with the facilities, as a Rochester City Court Judge, I find that those cells are the same size, or approximately the same size, as the 24 cells for females. (Croft, pp 6-22 [see Appendix, infra].)
(EE) The maximum cell capacity of the combined jail facilities is for 382 male prisoners (336 in the main jail, 46 in the city lockup section) and 26 female prisoners. In actual practice, however, the total is reduced to a workable capacity for 306 males and 21 females. That is occasioned by statutory and regulatory requirements for separation of certain classifications of prisoners (sentenced and unsentenced, adult and minor, civil and criminal, male and female, etc.). (See Correction Law, §§ 500-b, 500-c; 9 NYCRR 7013.1; Croft, pp 14-19, 78-80 [see Appendix, infra])
(FF) The parties stipulated that the cells in the main jail (housing male prisoners only) are 48 square feet in area.
(GG) Most of the women’s cells face other cells. None of the cells in the city lockup area (including the women’s cells) face windows. The cells in the main jail face windows and do not face other cells.
(HH) Females constituted about 8.5% of the 1974 total (8,024) jail population and about 10% of the 1975 total (7,621).
(II) Unsentenced prisoners composed over 92% of the female jail population during both 1974 and 1975.
(JJ) Felony commitments of females in 1974 totaled 225, including six for murder, 22 for robbery and 57 on drug charges.
Felony commitments of females in 1975 totaled 300, including 3 for murder, 27 for robbery and 60 on drug charges.
(KK) Most of the unsentenced females incarcerated during 1974 and 1975 were kept in custody for only one or two days; about 29% were held for more than five days; less than 19% were held longer than 10 days.
(LL) Sentenced females totaled 53 during 1974 and 59 during 1975. Their median length of sentence was between 41 and 60 days.
(MM) During 1974 the average daily prisoner population consisted of 303 males and 20 females; the highest number of males on any one day was 361 and the highest number of females was 31.
*323 During 1975 the average daily prisoner population consisted of 302 males and 17 females; the highest number of males was 361 and the highest number of females was 31.
(NN) As of December 31, 1975, the jail staff employees included 100 male guard personnel and 15 female guard personnel (one matron, three assistant matrons and 11 women jailers).
(00) The court judicially notices the following facts. The Monroe County Public Safety Building, which houses the jail, is one of three monolithic structures which, together with an underground garage and an open outdoor plaza, form the Monroe County Civic Center complex. The other two structures are the City of Rochester Public Safety Building (containing, inter alia, the City Police Headquarters and Magistrates’ courts) and the Hall of Justice, (housing the felony courts, all civil courts of record, and the Appellate Division, Fourth Judicial Department, together with its law library). The two Public Safety buildings are tied to an extensive underground tunnel security system leading to security elevators in the Hall of Justice whereby prisoners are transported directly to court. The Civic Center complex is located in a highly urbanized area, less than two blocks from the center of downtown Rochester.
(PP) Physical proximity to the judicial system and legal services is recognized as the major determinant in design location of pretrial detention facilities. (Moyer, p D3 2d [see Appendix, infra]; note, also, O’Hare v Malcolm, 78 Misc 2d 232.)
(QQ) The parties stipulated that defendant William Lombard is the Sheriff of Monroe County, that he has so served since January 1, 1974, and that he is responsible for the care and custody of inmates committed to the Monroe County Jail "and the Women’s Section of the Rochester City Jail”.
(RR) The parties stipulated that defendant Robert Stanwick is the Superintendent of the Monroe County Jail "and the Women’s Section of the Rochester City Jail,” that he has so served since July 1, 1973, and that he is responsible for the management and supervision of said facilities.
(SS) Superintendent Stanwick is third in line-of-command at the jail. He reports to the Sheriff and the Under sheriff and follows the policies and procedures prescribed by the Sheriff. Even when confronted by a copy of a court order directing *324 him and the other defendants herein to follow a certain procedure with respect to inmate disciplinary proceedings, and asked whether he intended to follow that procedure, Mr. Stanwick replied: "I will so advise the Sheriff” (as to the requirements of the order).
(TT) The Monroe County Jail is operated pursuant to applicable provisions of the Correction Law and the minimum standards promulgated by the State Commission of Correction.
The New York minimum standards have been judicially recognized as affording jail inmates greater rights than are guaranteed by the Constitution. (See Wilkinson v Skinner, 34 NY2d 53, 63, n 7, supra; Rhem v Malcolm, 371 F Supp 594, 633, affd 507 F2d 333, supra.)
(UU) The court judicially notes that the present minimum standards (applicable to county jails) of the State Commission of Correction (9 NYCRR Part 7000 et seq.) became effective on October 1, 1976. Sheriff Lombard testified that he would fully comply with the new standards insofar as he was able within the funding provided by the County Legislature.
(VV) The record reveals numerous attempts by Sheriff Lombard to obtain additional funding from the County Legislature to improve conditions of incarceration for the inmates of the jail in general and the women’s section in particular.
RESOLUTION OF THE ISSUES
This portion of the court’s decision combines additional findings of fact (and matters judicially noticed) with conclusions of law.
(c) Restrictions on Mail
(p) Restrictions on Use of Personal Stationery
Plaintiffs’ complaints concerning limited censorship of their incoming and outgoing mail raise no constitutional issues. Defendants were following the procedures outlined in the then-applicable minimum standards (7 NYCRR 5100.5), which were within their authority and permissible even under present case law (see Wolff v McDonnell, 418 US 539, supra; Sostre v McGinnis, 442 F2d 178, cert den 405 US 978; Williams v Ward, 404 F Supp 170; Chiarello v Bohlinger, 391 F Supp 1153.) Plaintiffs have no constitutional rights to use stationery of their own choice (United States ex rel. Dean v Johnson, 381 F Supp 495) or to have free use of the United *325 States mails or to require jail officials to pay for their postage (Tate v Kassulke, 409 F Supp 651). The current minimum standards do, however, grant them such privileges and also provide for the daily posting of outgoing mail. (See 9 NYCRR Part 7004; see [H], [M], [TT], supra.)
(d) Restrictions on Books and Publications
The pretrial order of Justice Boehm directed the defendants to discontinue a "from publishers only” rule, instead to promulgate rules permitting inmates to receive "from all sources” (including relatives and friends) books, periodicals, newspapers, magazines and any other literature, new or used, and to inform all inmates, on their entry to the jail, of their rights under such rules. Fourteen weeks later the Sheriff issued a "special order”, directed to jail personnel, dealing with the handling of incoming publications for inmates. That directive fell far short of even substantial compliance with Justice Boehm’s order. It contained no reference to an "all sources” rule or to the prohibition of a "publishers only” policy. Defendant Stanwick testified that written notice of inmates’ rights to receive publications (pursuant to the court’s order) was given to their visitors but not to the inmates. The head matron testified that the women inmates are orally informed of their court-ordered rights.
There may have been some understandable confusion in this area. On its face, the court order appears to apply to all inmates of the Monroe County Jail. The court lacked jurisdiction, however, to adjudicate in this proceeding the rights of male inmates of the jail. The plaintiffs were all "prisoners in the women’s section of the Monroe County Jail”. Although the lawsuit was pleaded as a class action, Justice Boehm’s order preceded the notice subsequently given to potential class members (CPLR 904) and Justice Patlow’s order allowing class action and describing the class (CPLR 902, 903). The injunctive relief ordered, therefore, could be binding only in favor of the named plaintiffs at that time. (See Schrader v Selective Serv. System Local Bd. No. 76 of Wisconsin, 470 F2d 73, cert den 409 US 1085.) That, of course, is consistent with the rule that a court cannot adjudicate the rights of those who are not before it. (See Ebsary Gypsum Co. v Ruby, 256 NY 406; Mahr v Norwich Union Fire Ins. Soc., 127 NY 452; cf. Bethview Amusement Corp. v Lorber, 35 AD2d 971.) The order, it is noted, did not require written notice to inmates.
*326 Although the defendants failed to comply with specific requirements of the court order, I do not presently believe that either did so wilfully. Those issues, however, would be properly determinable in contempt proceedings separately brought. Since I am aware of no general constitutional right to be informed of one’s First Amendment rights, it appears that defendants’ said nonfeasance is not actionable under section 1983.
An inmate’s right to receive books and publications is another matter. Plaintiffs proved that, prior to the issuance of Justice Boehm’s order, defendants maintained and generally enforced a "publishers only” policy at the jail. The Supreme Court has not yet addressed itself to this issue. Stanley v Georgia (394 US 557), proclaimed a First Amendment right to possess, and read or view, any communicative material in the privacy of one’s home. But Lanza v New York (370 US 139, 143) said that a jail shares none of the attributes of privacy of a home. In Procunier v Martinez (416 US 396, supra) dealing with prison inmates’ receipt of mail (letters), the court said (p 408) "we have no occasion to consider the extent to which an individual’s right to free speech survives incarceration”. Instead, the court decided the issue on the basis of the First Amendment rights of the correspondents outside the prison to communicate with the inmates. Even there, however, the court stated (p 408, n 11): "Different considerations may come into play in the case of mass mailings. No such issue is raised on these facts, and we intimate no view as to its proper resolution.”
Nevertheless, several post -Procunier decisions have dealt with the question of an inmate’s right to receive books and publications generally. (See Carpenter v State of South Dakota, 536 F2d 759; Morgan v LaVallee, 526 F2d 221; Hopkins v Collins, 411 F Supp 831; Cofone v Manson, 409 F Supp 1033; see also Powlowski v Wullich, 81 Misc 2d 895 [Boehm, J.], supra.) Those courts are in substantial agreement to the effect. that every prisoner has a presumptive First Amendment right to receive any written material addressed or delivered to him, a right which may be restricted by custodial authorities only through procedural due process and upon a substantial showing that a writing or publication poses a tangible threat to the order or security of the institution. I find that the foregoing authorities, and others they cite (one, as far back as 1970 — see Fortune Soc. v McGinnis, 319 F Supp 901) state what is now a *327 "clearly established” constitutional right of incarcerated persons. I cannot so readily hold, however, that it was clearly established as of March 21, 1975 (the date of Justice Boehm’s order) in view of the Supreme Court’s stated reluctance in Procunier v Martinez (supra) and its language in Lanza v New York (supra). (See also [A], [B], supra.)
Defendant Stanwick justified the "publishers only” policy on grounds of (1) prevention of contraband, and (2) prevention of books accumulating in an inmate’s cell. The validity of the contraband concern is unquestioned. (Wolff v McDonnell, 418 US 539, supra; Bach v People of State of Ill., 504 F2d 1100.) He also stated that the policy was "quite common throughout the county jails”. It does appear that the "publishers” rule was not unique to the Monroe County Jail. (See Cofone v Manson, 409 F Supp 1033, 1039, n 14, supra [US Bureau of Prisons]; Collins v Schoonfield, 344 F Supp 257, supra [city jail]; Powlowski v Wullich, supra [Genesee County Jail].)
No evidence was introduced of a single instance where any book or publication was addressed to, or brought or delivered for, a member of the plaintiff class who was prevented from receiving the same by the so-called "publishers” rule. On the whole record, I find no evidence to establish that prior to March 21, 1975 the defendants should reasonably have been aware that the rule violated the constitutional rights of any female inmate. (See [H], [I], [L], [Q], supra.)
The new minimum standards provide that a jail prisoner is entitled to receive any publication or printed material generally available to the public or which may be sent through the mails; that such material or publication may be "censored” (excluded) only where determined (by the chief administrative officer) to constitute a threat to the safety, security or good order of the jail; that the reasons for any such determination must be specified in writing, and copies given to the sender and the intended recipient; and that any affected person may appeal such determination to the citizens policy and complaint review board of the State Commission of Correction. (See 9 NYCRR Part 7026.)
Because I have found no actionable constitutional violation here, and because I find the present State minimum standards affording full protection to plaintiffs’ constitutional rights in this area, I hold that they are presently entitled to no further relief, legal or equitable, as regards issue (d). (See [UU], supra.)
*328 (e) Restrictions on Visitation
Regular Visitors (Non-Contact) — The parties stipulated that (as of April 1, 1976) the visiting hours for women were from 1:00 to 4:30 p.m., for sentenced inmates Mondays, Wednesdays and Saturdays, for unsentenced inmates Tuesdays, Thursdays and Sundays. Visiting hours for males are from 1:00 to 5:00 p.m. and are limited to 10 minutes per visit. Women inmates are permitted 15-minute visits, but they frequently ran longer, sometimes up to an hour, depending on the number of inmates and visitors at the time. There are three visiting booths in the women’s section. Inmates and visitors are separated by a floor to ceiling steel barrier. Visual contact is through a window in the barrier, approximately two feet by seven inches in size and 4 Vi feet from the floor. Telephones adjacent to the windows permit the parties to converse. Two visitors may occupy a booth at the same time. Regular visits are limited to family, flaneé or boyfriend, and friends (if inmate has no family).
The court observes that the foregoing arrangements would permit every female inmate to have at least one visitor each visiting day, even under the maximum population conditions existing during 1974 and 1975. (See [MM], supra.)
Special Visitors (Contact) — Inmates may receive personal, private direct-contact visits from attorneys and clergymen and, where applicable, from parole or probation officers, drug counselors, and students or other citizens involved in rehabilitation or similar community projects involving the jail.
No inmate of the Monroe County Jail (male or female) is permitted direct-contact visits by family members or friends. Defendants do not oppose implementation of a policy permitting such visits, but claim that it would require larger staff and facilities. They justify the present policy on the fear of entry of contraband or weapons through such visits and say that a special area would have to be constructed to permit "strip searches” of inmates following such visits. The legitimacy of defendants’ concern is judicially recognized. (See Wolff v McDonnell, 418 US 539, supra; Ison v Kennedy, 54 AD2d 1079; Bach v People of State of Ill., 504 F2d 1100, supra.) The new State minimum standards (see [UU], supra) provide for at least two one-hour visits per week and physical contact with all visitors. (See 9 NYCRR Part 7008.) Justice Miner (Supreme Court, Albany County) has declared the *329 State Commission’s contact-visit requirements unconstitutional on the ground that they are in direct conflict with sections 500-c and 500-j of the Correction Law. (See McNulty v Chinlund, 89 Misc 2d 713, supra.) Section 500-c permits a jail prisoner to converse with his counsel or religious adviser under such reasonable regulations and restrictions as may be fixed by "the keeper of the jail” (the Sheriff, in Monroe County). Section 500-j permits "at pleasure” visitation of county jails by certain designated public officials and clergymen, and further provides that no other person "not otherwise authorized by law” shall be permitted to enter the rooms of a county jail except as the Sheriff shall prescribe.
Plaintiff Doris McNair testified, from personal experience, that at Bedford Hills Correctional Facility, a State prison housing female felons, contact visiting is allowed one day a week, from 9:00 a.m. to 3:30 p.m., that up to four persons may visit an inmate at one time and that there is no other time limitation on the visits.
Plaintiffs allege that defendants’ denial to them of (1) contact visits with their families and friends and (2) contact visits and longer visits, such as are enjoyed by convicted felons at Bedford Hills, is cruel and inhuman and violates their due process and equal protection rights under the Fourteenth Amendment.
Contact Visits as a Constitutional Right — In Rhem v Malcolm (371 F Supp 594, supra; see [P] [2], supra), Judge Lasker discussed at length (pp 601-607) the psychological, sociological and penological reasons which he felt, on the evidence before him, justified his holding (p 626) that denial of contact visits to unsentenced inmates at the Tombs violated their constitutional rights. Although stating that such deprivation was "inhumane and cruel in fact,” the court did not rest its decision directly on the Eighth Amendment’s "punishments” provision, due to the Second Circuit’s conceptual doubt of its applicability to unséntenced persons (see Johnson v Glick, 481 F2d 1028, 1032, cert den 414 US 1033, supra). Instead, the District Judge found Fourteenth Amendment violations of the plaintiffs’ (1) due process rights to be free from cruel and unusual punishment, and (2) rights to equal protection of the laws, where the evidence before him established that inmates at all New York State prisons were allowed contact visits varying in length from two to six and one-half hours. In connection with another issue, the court stated (p 633): "the *330 City cannot, as a creature of the State, deny to its inmates the rights granted to State prisoners.”
In affirming, the Second Circuit agreed with Judge Lasker (507 F2d 333, p 339). After the Tombs inmates had been transferred to the House of Detention for Men, at Hiker’s Island, the same Judge held that contact visits were likewise constitutionally required at that facility (Rhem v Malcolm, 396 F Supp 1195, 1202, supra). Affirming again, the Second Circuit observed (527 F2d 1041, 1043) that "[a]n unconstitutional booth is no less objectionable because it sits in Riker’s Island rather than in the Tombs.” Judge Lasker’s holding (that contact visits are constitutionally required for pretrial detainees) has been followed in Miller v Carson (401 F Supp 835) and Detainees of Brooklyn House of Detention for Men v Malcolm (421 F Supp 832, supra). The National Sheriffs’ Association encourages contact visits. In their 1974, Handbook On Inmates’ Legal Rights, they state (p 42): "Mechanical barriers, such as glass partitions or bars, between the inmate and visitor should be avoided, since this tends to emphasize separation rather than to help retain bonds between the inmate and the outside world.”
The present plaintiffs are entitled to relief here, however, only if this court finds that they, or any of them, are clearly entitled to contact visits under the Constitution. For the following reasons, this court cannot so hold.
(1) There is a contrary body of Federal case law holding that visitation of inmates is a matter of privilege and not of right. (See Oxendine v Williams, 509 F2d 1405 — a prisoner has no constitutional right to physical contact with his family; McCray v Sullivan, 509 F2d 1332, 1334 — visitation privileges are a matter subject to the discretion of prison officials; Feazell v Augusta County Jail, 401 F Supp 405 — denial to a prisoner of a visit from his girlfriend "does not present a federal claim”; Henry v State of Delaware, 368 F Supp 286 — pretrial detainees have no Federal constitutional or statutory right to visitation privileges; Collins v Schoonfield, 344 F Supp 257, 279, supra — denial of contact visits to pretrial detainees "does not rise to the level of cruel and unusual punishment”; see also People v Von Diezelski, 78 Misc 2d 69, holding that various habeas corpus claims of a pretrial detainee in the Nassau County Jail, one being the lack of contact visits, did not render his detention unconstitutional or otherwise illegal.)
(2) At least on the facts in the present case, this court *331 cannot justify application of the due process holding of the Rhem court. Judge Lasker found (Rhem v Malcolm, 371 F Supp 594, 626, supra) that the Tombs detainees were in custody solely because of their inability to furnish bail. I find that the present plaintiff detainees are in custody because they have been accused, on constitutional probable cause, of the commission of criminal offenses. Although proceeding derivatively, through the deprivation of "liberty” aspect of the due process clause (see Johnson v Glick, 481 F2d 1028, 1032, cert den 414 US 1033, supra), the Rhem court nevertheless reached a conclusion that failure to provide contact visits at the Tombs was equivalent to Eighth Amendment proscribed cruel and unusual punishment. There was before this court (as there was, apparently, in Rhem) a wealth of evidence to show that contact visiting would be beneficial to the mental health and physical well-being of the inmates and would lessen tensions and the potential for disruption within the jail. But that evidence neither mandates nor justifies (to this court) a corollary finding that the absence of contact visiting is "barbarous” or "shocking to the conscience”. (See [F], supra.) Judge Lasker also found (p 625) contact visits required by "the doctrine of least necessary restraint * * * as a matter of due process”. As stated previously, the "doctrine” of least necessary restraint derives from the premise that the presumption of innocence is a concept of constitutional stature, a premise which has been found unsupportable as a matter of law. (See [O], supra.)
(3) This court also differs with Judge Lasker’s application of the equal protection Clause, there being neither unity of place nor unity of circumstances between the detention of prisoners awaiting trial in an urban court-adjacent facility and the detention of convicts in sprawling rural institutions. (See [G], supra.) As Judge Kaufman stated in Collins v Schoonfield (344 F Supp 257, 285, supra) "Plaintiffs contrast those facilities and programs, or the lack of them, at the jail with those in other Maryland prison institutions. But the latter, housing inmates for longer stays, and charged with rehabilitation, are provided with the opportunity of more time, and with more money and staff, and are hardly to be compared with a jail housing mostly pre-trial detainees.”
Moreover, I believe that a minimal requirement for proper consideration of an equal protection claim involving State prisons, no less in Rhem than in the present case, would be *332 the presence of the State Correction Commissioners as parties defendant. They are responsible for "State action” governing the custody of both State prisoners and county prisoners. The present defendants are not. They do not hold the plaintiffs under any State law, rule or regulation which either the Legislature or the commission, in the exercise of recognized discretion (see [B], supra), has seen fit to make applicable to prisoners in State facilities. Defendants keep their prisoners under the authority of article 20 (§ 500 et seq.) of the Correction Law and Part 7000 of the Minimum Standards and Regulations for Management of County Jails and Penitentiaries (9 NYCRR Part 7000), none of which provisions apply to State prisoners. Both defendants testified that they do not even know the rules and regulations applicable in State correctional facilities.
There are several well-recognized reasons for treating jail prisoners differently from convicted felons. The former are in and out of custody in almost revolving door fashion. The Sheriff’s annual statistics show approximately a 40% general population turnover every 48 hours. Pretrial detainees remaining in custody are subject to frequent court appearances, requiring special transport personnel and extra security precautions. Unsentenced prisoners (approximately 90% of the jail population) cannot constitutionally be required to work or to participate in rehabilitation programs (see discussions, infra, re issues Qj] and [k]). The status of the latter, however, is opposite in each respect. In definite confinement for periods ranging from one year to life, they can be (and are) housed in spacious high-walled facilities in rural areas, permitting the establishment and implementation of many programs (e.g., contact visiting), both indoor and outdoor, which are neither practical nor necessary in an urban court-adjacent detention center.
Subdivision 3 of section 230 of the Correction Law provided (as to crimes committed prior to September 1, 1967) that "jail time” spent in a local facility prior to sentence would not count in "good time” computation of a convict’s minimum parole date. The statute was attacked, on equal protection grounds, because it disfavored those incarcerated while awaiting trial as opposed to those who were able to secure their release on bail. The State defended the distinction on the ground that "good time” credit for parole eligibility is based to a large extent on evaluation of a prisoner’s rehabilitative *333 performance. Upholding the constitutionality of the statute, in McGinnis v Royster (410 US 263) the Supreme Court said (pp 270-271): "The Commissioner defends the distinction by noting that 'state prisons differ from county jails with respect to purpose, usage and availability of facilities.’ State prisons are 'intended to have rehabilitation as a prime purpose and the facilities at these institutions are built and equipped to serve this purpose.’ * * * County jails, on the other hand, serve primarily as detention centers. The commissioner asserts they are 'neither equipped nor intended to do anything more than detain people awaiting trial and maintain no schools, run no factories and require no work from these inmates.’ * * * These significant differences afford the basis for a different treatment within a constitutional framework.” (Emphasis mine.)
This court cannot fasten liability on these defendants (or order equitable relief) on the equal protection grounds stated by the Rhem court and approved by the Second Circuit. If the Erie County Sheriff, concededly acting under State law, decided to furnish each cell in the Erie County Jail with a bible, or a dictionary, would it be held that equal protection required the defendants, because they are also atting under State law, to do likewise for Monroe County inmates? I think not, yet I could barely distinguish such a holding from the rationale in Rhem.
(4) I believe that the holding in Rhem v Malcolm (supra) must be confined to the facts of that particular case. The Second Circuit therein stated (p 336) that the District Court’s findings presented "a melancholy picture of a fortress in bedlam” where (quoting Judge Lasker): "The totality of circumstances at [the Tombs] have produced dismal conditions significantly inferior to those existing at New York State penal institutions and many other municipal or federal houses of detention.”
I hold that issue (e) raises no constitutional claims cognizable for the present plaintiffs under section 1983. (See [A], [B], [G], [H], [N], [O], [P], [CC], [HH], [JJ], [KK], [LL], supra.)
(f) Restrictions on Use of Telephones
Plaintiffs, predominantly unconvicted detainees, allege unconstitutional encroachment on their First Amendment rights to communicate, by defendants’ restrictions on their use of telephones. State minimum standards allow a prisoner one *334 "free” call on initial entry, and further provide that (1) requests for additional calls should be decided on an individual basis, consistent with the prisoner’s situation, funds in his possession, possibility of reversing charges, etc., and (2) calls should be supervised and preferably made from an area where proper security and any necessary privacy can be maintained. (See 9 NYCRR 7002.1 [b].) In addition to the one call upon entry, defendants’ (unwritten) policy permits plaintiffs, sentenced and unsentenced alike, to make one call weekly thereafter (only to someone on an inmate’s regular visiting list). The calls are made in an open hallway, or corridor, opposite one of the dayrooms, under conditions of little or no privacy. Inmates do not not pay for these calls. There is no pay telephone installed in the jail for inmates’ use. The unwritten policy is not strictly observed. Most women inmates are permitted to make several calls a week, frequently several calls a day. Matrons make numerous calls for the women inmates, to contact their attorneys and to assist them in making bail. A written general order prohibits inmates from receiving incoming calls, but such calls may be received in emergencies. There is no limit on the number of letters an inmate may send (9 NYCRR 7004.1).
Prisoners have no constitutional right to make telephone calls. (Hill v Estelle, 537 F2d 214.) A jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. (Lanza v New York, 370 US 139, 143, supra.) Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail. (People v Lopez, 60 Cal 2d 223, 248 cert den 375 US 994.) When the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation. (Pell v Procunier, 417 US 817, 827, supra.)
I find no unconstitutional deprivation on the facts presented here. I can appreciate how alternatives such as (1) unlimited inmate access to telephones, or (2) installation of a pay telephone (assuming the willingness of the telephone company) might create administrative difficulties, due to factors such as "phone-hogging” or contention among inmates. The court is satisfied that under present conditions the plaintiffs’ most *335 important concerns, access to counsel and access to bail opportunities, are adequately protected.
(g) Improper Conduct of Disciplinary Proceedings
Following Wilkinson v Skinner (34 NY2d 53, supra) and Wolff v McDonnell (418 US 539, supra) plaintiffs were granted injunctive relief by Justice Boehm’s order of March 21, 1975 and my order of April 21, 1976 whereupon they consented to drop all claims for further injunctive relief insofar as this issue is concerned. There remain, however, questions of legal and/or declaratory relief to which plaintiffs may be entitled, if they have shown that the remaining defendants, or either of them, violated any of their constitutional rights in connection with the conduct of disciplinary proceedings.
Wilkinson involved solitary confinement of an unsentenced prisoner for five days in an isolation cell. Wolff dealt with a sentenced prisoner’s loss of accumulated "good time”. Cumulatively, they hold that before such "substantial” types of discipline may be imposed on a New York prisoner he must, as a matter of minimal procedural due process, be afforded:
(1) written notice, at least 24 hours in advance, of the charges against him and the evidence on which they are based;
(2) a right to call witnesses and present documentary evidence on his behalf, unless institutional safety or correctional goals would be thereby jeopardized (Wolff);
(3) the right to a quick and simple hearing (Wilkinson);
(4) an impartial trier of the facts at the hearing (Wilkinson; cf. Sostre v McGinnis, 312 F Supp 863, 872, revd 442 F2d 178, cert den 405 US 978, supra);
(5) a written fact-finding decision stating the evidence relied on and the reasons for the finding(s). (Wolff: although the Supreme Court did not specify that a copy of the decision be furnished to the inmate, it appears that such a requirement may be fairly inferred from the language of the opinion.)
It is very doubtful that due process would require these same procedures prior to imposition of "lesser” penalties, such as loss of privileges. (See Baxter v Palmigiano, 425 US 308, 323-324, supra; Wolff v McDonnell, 418 US 539, 572, supra; Matter of Amato v Ward, 41 NY2d 469, 472-473; Wilkinson v Skinner, 34 NY2d 53, p 58.)
On May 30, 1974, as a consequence of the Wilkinson deci *336 sion, defendant Stanwick promulgated to the jail staff a new "Policy on Discipline”. Shortly thereafter, the Sheriff informed the Superintendent in writing that the newly-promulgated procedures had been reviewed by the Sheriff and the Sheriff’s counsel and that the latter had advised that, in his opinion, they complied with the dictates of Wilkinson. Stan-wick testified that he had never read the Wilkinson decision. It was not shown that Sheriff Lombard had read the 'case either. It appears that both defendants relied on the legal advice of the Sheriff’s counsel insofar as interpretation and implementation of Wilkinson was concerned. The new procedures of May 30, 1974 did not in fact comply with Wilkinson. Specifically, they did not provide that the inmate should have (1) advance written notice of the charges and the evidence, and (2) a quick simple hearing, at which he could defend himself and explain his action before an impartial trier of the facts.
On July 16, 1974 the State Commission of Correction sent Sheriff Lombard a copy of proposed amendments to the State minimum standards covering inmate disciplinary proceedings in county jails. A covering letter stated that "Pertinent court decisions * * * have been taken into account”, but there was no reference to any particular case. The letter also advised that the amendments, if and when approved and certified, would have the force and effect of law. On November 6, 1974 the commission wrote again, advising the Sheriff that the proposed amendments (with very minor changes) had been officially enacted, to become effective on November 15, 1974. The newly-amended minimum standards (then 7 NYCRR 5100.7) provided, inter alia, that each prisoner be furnished a legible copy of a "list of rules and regulations governing prisoner conduct and containing standardized operating procedures which relate thereto”. Defendants did not promulgate the new rules, regulations and procedures, for either staff or inmates, until March 17, 1975. It appears that the delay was occasioned by their belief that the State Commission had to first approve the form of the rules and regulations issued for the Monroe County Jail. The newly-amended State minimum standards satisfied the requirements of Wilkinson, but not those of Wolff. They did not provide for (a) 24 hours advance (written) notice of the charges and the evidence, or (b) an inmate’s qualified right to call witnesses and present documentary evidence, or (c) a written decision stating the evidence and the reasons supporting the findings.
*337 The court judicially notes that the present minimum standards (9 NYCRR 7006.1) suffer from the same infirmity, for the commission has simply renumbered, without change, the amended standards afore-mentioned. It appears that the commission believes that the requirements of Wolff v McDonnell (supra) are applicable only to convicts in State prisons. (Cf. 7 NYCRR 253.1 et seq.) This court has no doubt that Wolff’s requirements are equally applicable in facilities such as the Monroe County Jail, where convicted prisoners may suffer "good time” loss, and all prisoners are subject to punishment up to seven days in isolation cells or up to 14 days "in lock” (9 NYCRR 7006.1 [c] [6]); see Wolff v McDonnell (418 US 539, 571, n 19, supra; Wilkinson v Skinner, 34 NY2d, 53, 58, supra). Curiously enough, in contrast to the State minimum standards, the regulations and procedures which the defendants promulgated on March 17, 1975 do comply substantially (although not entirely) with the requirements of Wolff (and fully with those of Wilkinson).
Plaintiff witnesses Elaine Reed, Doris McNair, Betty Tyson and Carol Ann Lewis testified to various occasions where disciplinary punishments were imposed on themselves and/or other inmates without benefit of the Wilkinson-Wolff procedural requirements. It appears that each of those occasions preceded the decisions in Wilkinson and Wolff. The Supreme Court in Wolff specifically declared its holding not retroactive and explained why not (pp 573-574). The same reasoning would render Wilkinson non-retroactive, unless our Court of Appeals were to hold otherwise (which it has not).
Margarett Pratt testified to two instances of punishment imposed on her, early in 1975, without proper notice or any hearing. On both occasions, she stated, she was placed "in lock” (confined to her own cell) for three days. She testified that she was punished the first time for banging on cell walls and talking loud at night and the second time for "tearing up” the day room, throwing games around, breaking a chair and throwing kool-aid off a table. There is nothing to show that either of these defendants was ever aware of either of those instances. Assuming the truth of her testimony, they are responsible, however, for not having timely implemented procedures to prevent either such occurrence. Nevertheless, on all of the evidence, I do not believe it can be held that either defendant was unreasonably unaware of Miss Pratt’s constitutional rights and I hold that the defense of good faith is *338 available to both. (See [L], [M], [Q], supra.) Neither defendant being trained in the law, I find it reasonable for them to have relied on the advice of the Sheriff’s counsel that they were in compliance with Wilkinson. Sheriff Lombard testified that he was not familiar with Wolff. Superintendent Stanwick said that he had read Wolff but that he believed (a) it was not yet applicable in New York, (b) it applied only to sentenced felons, and (c) the Sheriff’s counsel would have so advised them if it was applicable to the jail. Additionally, it is noted that Miss Pratt admitted in open court that she had committed the offenses for which she was punished.
Joanne Becoats, Ruby Gibson and Diane Wilson testified to various punishments imposed on themselves, wherein it appears that they were afforded the full panoply of their foregoing rights.
Joanne Becoats also testified that (because she was talking about breaking out of jail) she was placed overnight in a corridor cell in February of 1976, without notice, formal charges or a hearing. There is nothing in the record to show that either of the defendants was responsible for, or was even aware of, that incident. Personal involvement is requisite to liability in this lawsuit. (Rizzo v Goode, 423 US 362, supra.) As stated earlier herein, the doctrine of respondeat superior does not apply in section 1983 actions. (See, e.g., Johnson v Glick, 481 F2d 1028, 1034, cert den 414 US 1033, supra.)
As to issue (g), I find legal relief unwarranted and declaratory relief unnecessary.
(h) Exclusion of Women from Singer-Graflex Program
Prior to mid-1974, jail inmates participated in a rehabilitation-oriented project known as the "Singer-Graflex program” under a contract (presumably by the county) with SingerGraflex, a private organization which directed the project. Since it was rehabilitative, it was designed for sentenced prisoners only (see issue [k], infra). The project was intended to prepare prisoners for "work release”. It consisted of three phases: (1) vocational evaluation, (2) academic instruction, and (3) release to employer. Female prisoners were allowed to participate in all but the vocational evaluation phase. Vocational evaluation was effected by processing (male) inmates .through each of 10 separate carrels (e.g., refrigeration, carpentry, plumbing, etc.) to test their potential skills. Exclusion of women from that phase of the Singer-Graflex project was *339 explained on the grounds that (a) defendants were prohibited by law from "commingling” male and female prisoners, and (b) there were "too few” sentenced women to justify establishment for them of a separate evaluation program.
Section 500-c of the Correction Law provided (and still does) that no woman prisoner in a county jail shall "be kept in the same room with a man” (except her husband). Effective March 9, 1976, the Legislature inserted, immediately following that provision, a new sentence in the statute: "In the conduct of educational, vocational or divine worship programs, the strict separation of sexes need not be followed.” (L 1976, ch 24, § 1.)
It appears that the average number of female sentenced prisoners on any given day in 1974 was seven. (Croft, p 106 [see Appendix, infra].) As to this issue (h), plaintiffs’ concerns are limited to approximately a six-month period (February to August) in 1974.
The Singer-Graflex program was discontinued in the late summer of 1974 and was replaced by the (similar) present Manpower Correction Project. Under the new program, control of the project is in the hands of the Sheriffs Department, rather than the employer (as with Singer-Graflex). That change resulted in the inclusion of women prisoners in the vocational evaluation phase as well.
The terms of the Singer-Graflex contract were not before this court. There was no evidence of the measure of control, if any, exercised by defendants over the implementation or conduct of that program. There was nothing to show that any sentenced woman was deprived of "work release” status because of nonparticipation in the vocational evaluation phase. To the contrary, in fact, Albert Benedetto, the Director of Rehabilitation, testified about sentenced women placed on "work release” to Singer-Graflex. On all of the evidence, I hold that plaintiffs’ allegations under issue (h) are trivial and insubstantial and do not rise to the constitutional level of denial of equal protection of the laws. (See [G], supra.) It follows that no member of the plaintiff class is entitled to relief under this issue.
(i) Restrictions on Use of Gymnasium and Exercise Room
A gymnasium is located on the fifth floor (roof level) of the main jail. It consists of a basketball area, a weight room and a volleyball and handball area. Use by male inmátes is sched *340 uled for seven hours a week; use by females is for three hours a week. All three areas are available to all inmates. The gym officer, Michael O’Donnell, estimated 47% participation by the male population and 33% by the females. Use of weights is supervised and restricted according to the size and capability of an individual (male or female). Between January 1974 and September 1975 the women were scheduled for only 214 hours weekly gym time (compared to seven hours for the men). There is always a matron present when female prisoners are using the gym .facilities.
Male prisoners outnumber females on the order of 10 to one. (See [HH], [MM], supra.) That factor alone justifies greater male access time to the gymnasium facilities. Plaintiffs established no equal protection violations here. (See [G], supra.) A prisoner has no constitutional right to gymnasium privileges. (See Cotton v Hutto, 540 F2d 412.)
(j) Lack of Paying Jobs for Women Inmates
On page 46 of their posttrial brief, plaintiffs’ counsel cited seven cases to support their (presumably constitutional) claim that "defendants have an obligation to establish a constructive work program for both men and women.” Much time was spent reading through those cases to discover that only one of the seven supported the stated proposition, while three of the cases did not even discuss the issue (as to either men or women). It appears that counsel may not have read or digested many of the cases cited to the court. Citing thusly is not merely unprofessional, but also disserves the court, clients and counsel alike.
Unconvicted prisoners may not be required to work while in custody. That would be a violation of the Thirteenth Amendment (involuntary servitude) actionable under section 1983. (See Bell v Wolff, 496 F2d 1252; Fidtler v Hendricks, 317 F Supp 738.) Convicted prisoners, however, have no Federally protected right to refuse to work, even though their convictions may be on appeal. (Draper v Rhay, 315 F2d 193, 197.) Prisoners are not constitutionally entitled to be paid for labor they are required to perform while incarcerated. (Sigler v Lowrie, 404 F2d 659, 661-662; Beatham v Manson, 369 F Supp 783, 785, 788, supra; Sims v Parke Davis & Co., 334 F Supp 774; Wilkinson v McManus, 299 Minn 112.) There is no constitutional right to a particular job in a correctional institution. (Banks v Norton, 346 F Supp 917, 921.)
*341 Yet correctional officials may not act arbitrarily, so as to keep a particular individual or a particular class of individuals from paying work assignments, or from equal pay for performing such assignments or from "trusty” positions earning special privileges. (See Mitchell v Untreiner, 421 F Supp 886, 895; Beatham v Manson, supra, p 785.)
The proof at trial showed that both male and female sentenced prisoners performed certain jobs in "trusty” positions for which they received remunerative "allowances”. It was not shown that there was any difference in the amounts thus received. Males thus employed could do maintenance work (cleaning and general housekeeping) in the male housing area and could also wash cars and work in the kitchen, the library and the tailor shop. Women, on the other hand, were confined to maintenance and serving meals, in the female housing area, and work in the tailor shop. Defense witnesses justified the exclusion of female prisoners from kitchen, library and car-washing jobs because (1) defendants were prohibited from "commingling” male and female prisoners, and (2) every female inmate outside her immediate housing area must be accompanied by a matron. The Sheriff also mentioned the fact that there are knives in the kitchen.
For certain purposes, the equal protection clause of the Fourteenth Amendment follows a person through prison walls. (See [E] [5], supra.) This court holds, as a matter of constitutional law, that the area of prisoner employment is one of such purposes. It does appear that defendants’ positions with respect to "commingling” and matron-presence are well taken. (See Correction Law, § 500-c [prior to 1976 amendment]; County Law, § 652 [subd 2]; former 7 NYCRR 5100.4 [k]; [present] 9 NYCRR 7003 [k].) But those provisions do not render constitutional defendants’ actions in treating female convicts differently from male convicts insofar as custodial employment is concerned. Instead, they merely serve as good defenses here to claims of sentenced plaintiffs for money damages. (See [L], [M], [Q], supra.) The 1976 amendment to Correction Law, § 500-c has removed the "commingling” bar to equal employment opportunity (see discussion re: issue [h], supra). The expense of having an additional matron (if necessary) present cannot excuse denial of clearly established constitutional rights. (See [D], supra.) Administrative convenience is not an acceptable justification for sex discrimination, even *342 in a custodial setting. (See Frontiero v Richardson, 411 US 677; Reed v Reed, 404 US 71.)
Accordingly, this court declares, as a matter of constitutional law, that whatever criteria defendants employ for (1) assigning remunerative work, or (2) awarding "trusty” status, must henceforth be applied equally to male and female prisoners alike. The court recognizes, of course, the physical differences between the sexes and assumes that particular criteria will take those into account where relevant.
The court also enjoins the defendants forthwith (from the time of entry of judgment hereon) from violating the constitutional rights, as above declared, of any member of the plaintiff class.
(k) No Rehabilitation Programs for Unsentenced Inmates
Only an offender who has been convicted may be subjected to rehabilitation, which is a facet of incarceration following sentence. (See People ex rel. Carter v Warden, 62 Misc 2d 191; Carlson, p 617 [see Appendix, infra]. See also People v Wilson, 17 NY2d 40.)
Even sentenced prisoners have no constitutional right to rehabilitation. (Barnes v Government of Virgin Is., 415 F Supp 1218, 1226; Pugh v Locke, 406 F Supp 318, 330; Padgett v Stein, 406 F Supp 287, 296, supra.)
The Supreme Court said, in dicta, in McGinnis v Royster (410 US 263, 273): "it would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence.”
In this court’s view, it would be more than "hardly appropriate”. I believe such action by the State, without the consent of an unconvicted prisoner, could well be a violation of the Eighth Amendment.
Rehabilitative efforts to date have proved to be the most dismal failure in American penology (Carlson, p 627 et seq. [see Appendix, infra]).
To this court, the claim that unsentenced prisoners are constitutionally entitled to rehabilitative programs is frivolous and unsupportable as a matter of law.
(1) Undersize Jail Cells
(w) Cells Neither Have Windows Nor Face Windows
As stated earlier, the parties stipulated that the plaintiffs *343 are generally housed in 37-square-foot cells, while the cells for male prisoners in the main jail measure 48 square feet. (See [BB], [FF], supra.) The proof at trial showed that most women’s cells face each other, and do not face windows, while men’s cells in the main jail face windows and do not face other cells. (See [GG], supra.)
In Detainees of Brooklyn House of Detention for Men v Malcolm (520 F2d 392, supra) the court (citing sources) observed (p 397, n 19) that: "As far back as 1790 the Walnut Street Prison in Philadelphia provided for individual cell blocks comprised of cells eight feet by six feet and ten feet high * * * Even the infamous Newgate of Dickens’s England had individual eight by six foot cells”.
In Pugh v Locke (406 F Supp 318, 334, supra) the District Court, judicially drafting minimum constitutional standards for the Alabama State prison system, stated that: "Each inmate shall have a minimum of 60 square feet of living space.”
California minimum standards for local detention facilities (1973) required cells at least six feet wide and eight feet deep (ABA Survey, p 155 [see Appendix, infra]).
Taylor v Sterrett (344 F Supp 411, mod 499 F2d 367, cert den 420 US 983) enjoined Dallas County officials from further noncompliance with a Texas statute requiring individual jail cells to have a minimum floor area of 40 square feet.
Ambrose v Malcolm (414 F Supp 485, 492-493) judicially noted the National Sheriffs’ Association, Handbook on Jail Architecture-1975 (single occupancy detention rooms should average 70-80 feet) and the standards of the United States Army confinement system-1969 (55 square feet per prisoner).
The New York minimum standards (7 NYCRR 5100.2 [c]) formerly provided that cells should be six feet wide, eight feet long and eight feet high. That provision, however, was repealed, effective September 25, 1972. There are no current standards in New York regarding jail cell size (Wasser, see Appendix, infra).
The court in Rhem v Malcolm (371 F Supp 594, affd 507 F2d 333, supra) found (p 627) that the plaintiffs’ "inability to see the sun, sky or outside world” unnecessarily burdened their health and was a deprivation "of constitutional magnitude”. Counsel for the present plaintiffs have also cited other similar *344 district court holdings. Former 7 NYCRR 5100.2 (d) provided that "Cells should face windows”. That provision was also repealed (eff Sept. 25, 1972) and the current standards contain no similar requirement (Wasser, see Appendix, infra). There was no evidence before this court that the health of any member of the plaintiff class was adversely affected because she had no window in her cell or because her cell faced no windows. As with contact visiting (issue [e], supra), there is no doubt that the presence of windows would be psychologically beneficial to the plaintiffs. But this court cannot agree that the presence or contraposition of windows is a constitutional right or that their absence amounts to cruel and unusual punishment. (See [F], [H], [I], [N], [P], supra.)
Because it is not constitutionally so empowered, this court will not (as did the court in Pugh v Locke, supra) declare minimum standards for cell sizes in the Monroe County Jail. Courts in New York do not sit in review of the Legislature (Edgar A. Levy Leasing Co. v Siegel, 194 App Div 482, affd 258 US 242) and cannot substitute their judgment for that of the Legislature (Lincoln Bldg. Assoc. v Barr, 1 NY2d 413, app dsmd 355 US 12). The authority to make such determinations for county jails has been vested in the Legislature and the State Commission of Correction. (Matter of County of Cayuga v McHugh, 4 NY2d 609, 615.)
The court does, however, possess the corollary power to determine that jail cells are constitutionally inadequate, whether because of size alone or becuase of a combination of factors. The court now exercises that power. I hereby declare that it is a clear violation of plaintiffs’ equal protection rights, not supportable by any compelling State interest or rational differentiation in classification, for plaintiffs to be housed under conditions substantially inferior to those under which the majority of male prisoners are confined. (See [C], [D], [E] [5], [G], [J], supra.) For each prisoner confined more than a few days, her jail cell is (in effect) her home. Except for breakfast in a day room, each plaintiff is locked in her cell from about 10:00 p.m. to 9:00 a.m. and at various other times during the day. Sheriff Lombard admitted that plaintiffs were housed in cells specifically designed for "overnight” detention, and he acknowledged "a question as to privacy” where most women’s cells (with open toilets) face the cells of other inmates. Equal protection also demands that if men’s cells face windows, women’s cells must likewise.
*345 I find, however, as to past violations hereunder, that the "waiver” given by the State Commission to the Monroe County Sheriff in 1971 established a good-faith defense for these defendants ([L], [M], [Q], supra; Walsh [see Appendix, infra]).
The court recognizes that this unconstitutional situation cannot practicably be remedied overnight. Defendants will doubtless need legislative assistance, lest, in compliance with this court’s directions, prisoners be turned loose whom other courts have committed to incarceration. Therefore, the court enjoins both defendants as follows:
(1) On and after September 1, 1978 no female prisoner may be kept in custody later than 72 hours following arraignment on the charge(s) on which she was arrested (cf. CPL 180.80) unless she is kept under conditions substantially equivalent to those whereunder defendants generally keep , male prisoners in their custody;
(2) On and after September 1, 1979, and under the same strictures and provisions as in (1) above, no female may be kept in custody later than 24 hours following arraignment;
(3) The provisions of (1) and (2) above shall apply to custody as a consequence of any one arrest, regardless of the number of charges;
(4) The provisions of (1) and (2) above shall not apply in cases of riot, civil commotion or unforeseeable emergency; the failure of other responsible authorities to provide adequate physical facilities for compliance with this court’s directions will not be considered as such unforeseeable emergency;
(5) As far as cell floor area alone is concerned, square footage will be deemed "substantially equivalent” which is within 5% of that of the men’s cells in the main jail.
Strict compliance with the foregoing directions of this court shall be deemed to relieve defendants of any continuing personal liability for violation of plaintiffs’ equal protection rights as aforesaid.
(m) Overcrowded Facilities; Insufficient Cells
Overcrowding of prisons or local detention facilities violates the due process and equal protection rights of the inmates therein. (Detainees of Brooklyn House of Detention for Men v Malcolm, 520 F2d 392, 399, supra; Costello v Wainwright, 397 *346 F Supp 20, affd 525 F2d 1239, vacated 539 F2d 547, revd 430 US 325).
"[Correctional institutions must be more than mere depositories for human baggage” (Detainees of Brooklyn House of Detention for Men, supra, p 397 [pretrial detainees]).
"A free democratic society cannot cage inmates like animals in a zoo or stack them like chattels in a warehouse and expect them to emerge as decent, law abiding, contributing members of the community. In the end, society becomes the loser.” (Costello v Wainwright, supra, p 38 [State prisoners].)
"Corrections has a long history that illustrates the deleterious effects of continued overcrowding. The Walnut Street Jail during its first ten years stood as a model of humaneness and reform; it represented one of the most important advances in history in the art of corrections. Its success was destroyed mainly by overcrowding. Overcrowding was also a major factor in the degeneration of the Auburn system into one of harsh punishment and incredibly strict discipline.” (Carlson, p 635 [see Appendix, infra].)
A. Overcrowding Beyond Design or Rated Capacity — More Prisoners Than Cells
The women’s section of the jail contains 24 regular cells, two corridor cells (intended for administrative or punitive segregation) and two day rooms (not intended for housing of inmates). (See [AA], [BB], supra.) The "rated” maximum cell capacity for this section is for 26 prisoners (Croft, pp 19, 24 et seq. [see Appendix, infra]). During 1973 the female prisoner population exceeded its "rated” capacity on 176 of the 365 days, reaching a high of 51 on one day. Highs of 31 inmates were recorded in both 1974 and 1975, and between June 1, 1974 and July 1, 1975 there were 14 occasions when, due to overcrowding, female inmates slept on mattresses on the day room floors. There were also a few occasions in 1976, prior to trial, when women were forced to sleep in the day rooms.
Noted penologist William Nagel, author of "The New Red Barn”, testified (for plaintiffs) that overcrowding requiring plaintiffs to sleep in the day rooms, where they also spent most of thé daytime hours, would raise their levels of aggression and lead to secondary problems such as tensions, nervousness, headaches and fights. Doris McNair and Betty Tyson *347 testified to fighting, arguments and the unpleasant smell of body odors.
Confinement of prisoners in excess of a facility’s rated capacity is a violation of inmates’ constitutional rights. (Ambrose v Malcolm, 414 F Supp 485; Pugh v Locke, 406 F Supp 318, supra; Miller v Carson, 401 F Supp 835; Costello v Wainwright, 397 F Supp 20, affd 525 F2d 1239, vacated 539 F2d 547, revd 430 US 325, supra; see, also, Detainees of Brooklyn House of Detention For Men v Malcolm, 520 F2d 392, supra; Valvano v Malcolm, 18 Crim L Rep 2394.)
The "waiver” which the State Commission gave the Monroe County Sheriff (Mr. Lombard’s predecessor) on December 16, 1971 approved the use of the present women’s section for the confinement of "all female prisoners” on a continued temporary basis. (See [AA], supra). The commission not having revoked or terminated that determination, it once again appears that defendants have established a good-faith defense which will relieve them of personal liability here. (See [H], [L], [M], [Q], supra.) The record also showed that defendants at times transferred sentenced female prisoners to jails in Erie County and Ontario County to relieve overcrowding (Croft, pp 24, 29 [see Appendix, infra]). No evidence was introduced, however, as to the authority for, or the circumstances surrounding, such transfers.
B. Overcrowding Beyond "Workable” Capacity — Inability to Maintain Required Classifications
The Correction Law and the commission’s minimum standards require separation of six different classifications of female prisoners (see [EE], supra). Two of the categories (adult civil prisoners and minor civil prisoners) are seldom encountered. As a result, the "workable” capacity of the female section which, as a practical matter, will permit adherence to the State separation requirements is 21 inmates, a figure which was exceeded on 340 of the 365 days in 1973. Of course, every time the rated capacity is exceeded the workable capacity is exceeded to an even greater extent. The evidence amply demonstrated defendants’ inability to maintain the required separations (Croft, pp 26-30, 65, 71 [see Appendix, infra]). Subdivision 8 of section 45 of the Correction Law empowers the State Commission to close a county jail which is "unsafe, insanitary or inadequate to provide for the separation and classification of prisoners required by law” or which has not *348 adhered to the minimum standards promulgated by the commission.
The authority to establish and promulgate minimum standards was given to the State Commission by chapter 706 of the Laws of 1965 and presently appears in subdivision 6 of section 45 of the Correction Law. The court is not prepared to hold that failure to comply with provisions of the Correction Law or of the State minimum standards is ipso facto a violation of a Federal constitutional right. The court is aware of no controlling authority which so holds. (Cf. Taylor v Sterrett, 344 F Supp 411, 418, mod 499 F2d 367, cert den 420 US 983, supra.)
However, on the basis of the authorities previously cited, the court hereby declares that it shall be violative of the due process and equal protection clauses of the United States Constitution for defendants, or either of them, or their successors:
(1) to confine overnight in a detention facility any female prisoners in excess of the design or "rated” capacity for such facility, except in cases of riot, civil commotion or unforeseeable emergency (as heretofore limited); or
(2) to confine any female prisoner overnight in a detention facility, whether she be segregated or unsegregated, except in cases of riot, civil commotion or unforeseeable emergency, as aforesaid, unless;
(a) such prisoner has a bed and mattress substantially equivalent in size to those used by the prisoners generally in such facility, and
(b) if such prisoner is in dormitory or other multiple confinement, the said place of confinement has at least one toilet, one sink with running water, and square footage per inmate therein substantially equivalent to that of a female prisoner generally housed in a single cell.
The court also enjoins the defendants forthwith (from the time of the entry of judgment hereon) from violating the constitutional rights, as above declared, of any member of the plaintiff class.
For the purposes of both declaratory and injunctive relief, as concerns this issue (m), the present adjunctive women’s section of the Monroe County Jail shall be considered a "detention facility”.
*349 (n) Denial, of Bail to Indigent Pretrial Detainees
Plaintiff pretrial detainees allege denial of their equal protection rights to incarcerate them solely because they are too poor to raise bail. They claim invidious discrimination because wealthier people charged with the same crimes are afforded unrestricted access to counsel, the opportunity to do legal research and contact witnesses, and the opportunity to obtain proper rest and nutrition and to maintain their physical and emotional health, all of which enable them better to prepare for trial.
Essentially similar arguments were considered and rejected in Morris v Crumlish (239 F Supp 498, affd 355 F2d 710, supra). There the court said (p 500): "Unquestionably there is a difference in the treatment of those free on bail and those in custody in default of it. The difference is a form of discrimination, but the Constitution only prohibits unequal treatment based on unreasonable classification, i.e. invidious discrimination * * * There is no valid basis for comparing the status of freedom with that of confinement. The one is the antithesis of the other. Confinement carries with it a suspension of or a restriction upon the exercise of most of the rights of free men, not the least of which is liberty itself * * * If the classification of jail versus bail is a constitutionally permissible one, those in the one category are not entitled to the equal protection of the laws with those in the other. The classification is not only constitutionally permissible, it is expressly provided and guaranteed by the Eighth Amendment to the Federal Constitution * * * Since it is constitutionally sanctioned, the classification cannot be made the basis for a charge of discrimination. ” (Accord Royster v McGinnis, 332 F Supp 973, 977, revd on other grounds 410 US 263, supra; see, also, [O], supra.) This court agrees, and finds no constitutional deprivation warranting relief as to issue (n).
(q) Restrictions on Access to Counsel
No evidence was introduced to show that any member of the plaintiff class was denied access to an attorney at any time. Superintendent Stan wick testified that it is a policy at the jail to deny an attorney access to an inmate only where (1) the inmate has specifically so requested, or (2) where the inmate is already represented by counsel and such counsel has specifically so requested. The court finds here no constitutional deprivation warranting relief.
*350 (r) Invalidity of Regulations Regarding Punishment of Inmates for Infractions
Plaintiffs alleged that (1) defendants published rules and regulations governing inmate behavior which are unduly vague, which give no adequate notice of the proscribed conduct and which are selectively enforced by defendants and their staff, and (2) that penalties for infractions are arbitrarily imposed and often not matched to the particular offense. I find that plaintiffs have failed to sustain their burden of proof as to any of those allegations.
The parties stipulated that the rules and regulations promulgated by defendants on March 17, 1975 (see issue [g], supra) were the only written rules followed with respect to disciplinary matters within the jail. The court has examined those rules and regulations, and the accompanying procedural rules as well, and finds them to be sufficiently clear, understandable and reasonable. (It appears that there are or were, in fact, additional written rules of conduct, for women inmates, but those were never placed before the court.)
Although defendants have prescribed general and specific rules for inmate conduct and behavior within the jail, the penalties which may be imposed for rule infractions have been prescribed by the State Commission of Correction. They appear in 9 NYCRR 7006.1 (c) (6) (formerly 7 NYCRR 5100.7 [c] [6]) and include "one or more” of the following: (1) loss of privileges (to be specified by the custodial facility) for up to 14 days; (2) confinement "in lock” (in one’s own cell) for up to 14 days; (3) solitary confinement in an isolation cell for up to seven days; (4) restitution for intentional damage to public property; and (5) loss of "good time” (for sentenced prisoners). Defendants’ rules specify the privileges which may be lost as including movies, recreation, library, commissary, attendance at special functions or assemblies, and visits. Penalties are imposed only after an inmate has been afforded procedural due process. The State minimum standards (and defendants’ rule) also provide that the action , taken shall be based upon "an evaluation of the prisoner’s attitude and overall adjustment to the discipline and order required in the facility” as well as on an evaluation of the facts and circumstances of the particular incident.
Marie Hochreiter, head matron since November 1, 1973, testified that (a) neither of the corridor (isolation) cells had been used for discipline during her tenure, (b) visiting privi *351 leges have never been taken away as a discipline, (c) only once in the two years prior to trial had an inmate lost "good time” (one day), and (d) "good time” loss was imposed only as a last resort.
As evidence of lack of substantive due process (arbitrary imposition of penalties disproportionate to infractions committed), plaintiffs point to two instances where inmates were placed "in lock” for 10 days. In one Diane Wilson called a nurse a "white bitch,” and continued to be abusive toward her, because the nurse refused to give her Ben-Gay, but offered her Tylenol instead. Wilson had claimed arthritic pain in her legs and said that the Tylenol was "no good”. In the other, Ruby Gibson violated a rule requiring removal of hair rollers after 9:00 a.m. and defied repeated requests by a matron that she remove them from her hair.
Several factors preclude the court’s finding of lack of substantive due process here. Wilson and Gibson were both sentenced inmates. Disciplinary action is a positive factor in the rehabilitation of prisoners and the morale of the facility (9 NYCRR 7006.1 [a] [3]). As to Wilson, the court perceives a definite distinction between cursing a guard or matron (cf. McDonnell v Wolff, 342 F Supp 616, 627-628, supra, later history not pertinent) and cursing a doctor, nurse, clergyman or other professional person who is present solely to assist the inmate. Cursing and similar abusive language "clearly is not compatible with rehabilitation of a convicted detainee” and may well justify lock-up status or isolation for the prisoner. (Collins v Schoonfield, 344 F Supp 257, 273, supplemented in 363 F Supp 1152, supra.) As to Gibson, the time (11:15 a.m.) of her final refusal to obey the matron indicates that it was in the day room, in the presence of other inmates. Willful refusal to obey an order, or demonstrated defiance of. personnel acting in the line of duty, may constitute sufficient basis for placing an inmate in segregation. (Sostre v McGinnis, 442 F2d 178, 192, cert den 405 US 978, supra.) The record further reveals that Gibson was apparently a "problem” prisoner and that she had been confined five days "in lock” shortly prior to the foregoing incident. Multiple penalties might have been imposed on these two prisoners, but were not. Not even one day of "good time”, surely the severest punishment, was assessed against either. Nor was either placed in solitary confinement. It appears that "in lock” prisoners may receive visitors and attend church services and are permitted out of their cells *352 daily to shower and to exercise. Finally it is noted that, pursuant to defendants’ procedural rules, the superintendent personally reviewed and endorsed both dispositions.
On page 40 of their brief, plaintiffs’ counsel state that "Defendant’s current punishment scheme fails to provide for penalties which are proportional to the rule infraction, and thus violate the plaintiffs right to due process under law”. They cite four cases as authority. Only one of the four might be construed to support the foregoing statement (see Craig v Hocker, 405 F Supp 656, 662) and the other three do not. What those cases do hold is that there must be substantive due process, i.e., that the punishment which is in fact imposed must not be disproportionate to the offense committed. (See Adams v Carlson, 488 F2d 619, 635-636; McDonnell v Wolff, 483 F2d 1059, 1063, affd in part and revd in part 418 US 539, supra.) The penalties imposed in such proceedings are not punishment in a criminal sense, but are instead administrative disciplinary sanctions imposed on the prisoners for breaking the rules of the facility. (Gregory v Wyse, 512 F2d 378.)
The court agrees with defendants that they should be afforded considerable leeway and flexibility, to „enable them to maintain order and security in the jail. I find no constitutional deprivation warranting relief as to issue (r).
(s) Failure to Furnish Inmates with Personal Hygiene Items
At all times pertinent herein, the State minimum standards have provided that "Health and hygiene items such as soap, razors, toothbrush and toothpaste should be furnished to all prisoners as needed, and arrangements made for prisoners to obtain other necessary toilet articles such as hair shampoo, deodorants, after-shave lotion, etc., as approved by officials” (emphasis mine). (See 9 NYCRR 7005.1 [b] [formerly 7 NYCRR 5100.6 (b)].)
The cumulative evidence of testifying plaintiffs showed that (1) aside from soap, the above items were not furnished to them by defendants or jail personnel; (2) even if inmates brought such items with them on entry, jail officials would not permit the inmates to keep them; and (3) inmates who could afford to purchase such items had to wait from one to three days to receive them after ordering them from the commissary. One plaintiff testified that, not having any money to buy *353 them, she obtained personal hygiene items from fellow prisoners.
William Nagel, plaintiffs’ corrections expert, acknowledged the existence of security problems in permitting prisoners or their friends to bring in such items. Head matron Hochreiter testified that a private group, Church Women United, provided female inmates "when they enter the jail” with a "care bag” containing toothpaste, a toothbrush, a shower cap, "foo-ties,” and kleenex; that inmates can buy shampoo or deodorant at the commissary; that matrons provide the inmates with shampoo, deodorants and toothpaste if they say they don’t have any and are indigent; that she considered a toothbrush and toothpaste to be essential items; and that she didn’t know why hygiene items were not furnished to inmates by the jail authorities.
Mr. Nagel offered his opinion that "reasonable humanity” required officials to furnish inmates with personal hygiene items "just to maintain sanitary conditions and health”, and he said that soap, toothpaste, a toothbrush, a comb, shaving cream and a non-injurious razor were "minimal” requirements. The Supreme Court has repeatedly echoed former Chief Justice Warren’s statement (in Trop v Dulles; 356 US 86, 101) that the "punishments” provision of the Eighth Amendment must be measured against "the evolving standards of decency that mark the progress of a maturing society”. (See Estelle v Gamble, 429 US 97, supra; Furman v Georgia, 408 US 238; Witherspoon v Illinois, 391 US 510.) Several courts have grounded Eighth Amendment or Fourteenth Amendment violations on the failure of custodial officials to furnish prisoners with basic hygiene items. (See Pugh v Locke, 406 F Supp 318, 334, supra; Miller v Carson, 401 F Supp 835, 855; Campise v Hamilton, 382 F Supp 172, 176, 179; Jones v Wittenberg, 330 F Supp 707, 711, 718, affd 456 F2d 854; see, also, National Sheriffs’ Association’s Handbook on Inmates’ Legal Rights-1974, p 15.)
The court finds it unnecessary to resolve apparent conflicts in the afore-mentioned testimony. Even were I to do so in plaintiffs’ favor, the record contains nothing to show either defendant’s knowledge or belief that plaintiffs’ hygiene needs were not being timely met. The minimum standards, it is recalled, do not state that hygiene items "must” be furnished, and they do state "as needed” (requiring an awareness of need). Also, so far as potential legal liability is concerned, the *354 court cannot hold with any degree of confidence that defendants reasonably should have known that plaintiffs were being deprived of any clearly established constitutional rights. (See [H], [I], supra.)
The court believes it is aware of which conditions may be considered "shocking to the conscience” of the enlightened citizens of Monroe County. For that reason, the court will grant equitable relief as to issue (s).
The court hereby declares that it shall be violative of the Eighth and Fourteenth Amendments to the United States Constitution for defendants, or either of them, or their successors, to keep any female prisoner in custody in any detention facility (including the present adjunctive women’s section of the Monroe County Jail), unless:
(1) within two hours of her arrival at a housing unit of said facility, such prisoner be furnished, at public expense if necessary, with toilet paper; a towel; a comb; a toothbrush; sufficient amounts of soap, toothpaste and deodorant for at least three days’ normal usage; and (if required) sanitary napkins or tampons, as may be needed; and
(2) such prisoner be kept fully supplied with such hygiene items, as her needs may require, at public expense if necessary, at all times until she is lawfully released or discharged from such custody; and
(3) within 48 hours of her arrival at such housing unit, such prisoner be permitted to receive and to have, through purchase or gift (subject to reasonable prior inspection for security purposes), a shower cap; a hair brush; a non-injurious razor; and sufficient amounts of shaving cream and shampoo as her needs may require (and to be replenished in like manner, by purchase or gift, as her continuing needs may require).
The court also enjoins the defendants forthwith (from the time of the entry of judgment, hereon) from violating the constitutional rights, as above declared, of any member of the plaintiff class.
(t) Lack of Proper Classification Systems
As previously noted, all plaintiffs are housed in a maximum-security facility ([CC], supra). But maximum security is not required for all members of the class, they claim, and it is therefore constitutionally required that defendants employ a *355 classification system to separate those who may be held less restrictively. Their claim is judicially supported by Rhem v Malcolm (371 F Supp 594, 624-625, affd 507 F2d 333, supra), Taylor v Sterrett (344 F Supp 411, 423, mod 499 F2d 367, cert den 420 US 983, supra), Jones v Wittenberg (330 F Supp 707, 717, affd 456 F2d 854, supra); and other cases cited by plaintiffs. (See, also, Pugh v Locke, 406 F Supp 318, 324, 333, supra [State prisons].)
"However representative the maximum security nature of MHD [The Tombs] may be, the question remains whether confinement in such circumstances abridges the rights of the large number of detainees who pose no risk to the security of the institution, and whose appearance at trial can be assured without such rigorous restraint. It must always be remembered that but for his inability to provide bail every detainee at MHD would be free to lead his life without any restraint until and unless he was tried and convicted.” (Emphasis in original.) (Rhem v Malcolm, supra, p 624).
So stating (above), the District Court in Rhem (supra) found resultant due process (cruel and unusual punishment) and equal protection violations and mandated establishment of a classification system as "the first step” in correcting such violations. The court then announced (p 625) that, in requiring such relief: "we join a parade of other federal courts which in recent years have imposed similar provisions in order to protect the constitutional rights of detainees [citing cases]”.
As to issue (t), however, this court is not about to fall in step and join the "parade”. The court has observed that if and when prisoners’ civil rights cases reach the United States Supreme Court, that tribunal almost invariably finds that the lower Federal courts have been too liberal in their interpretations of what the Constitution does and does not require. (See [P] [1], supra.)
"This is but another in a long line of cases in the federal courts raising questions concerning the authority of the States to regulate and administer matters peculiarly local in nature. * * * The issue * * * i8 * * * whether the Federal Constitution prohibits” (the action of of State officials). (Burger, Ch. J., concurring, Jones v North Carolina Prisoners’ Union, 433 US 119, 136-137.)
The thesis of Rhem (supra) might supply an argument for abolition of the bail system, but for this court it does not pass constitutional muster. Again, it is bottomed on the premise *356 that the "presumption of innocence” is a concept of constitutional rank, a premise which I have found unsupportable as a matter of law. (See [O], supra.) Plaintiffs here presented five witnesses presumably representative of the "pretrial detainees” in the class. By the time of trial, all five had been convicted of felonies and sent to a State prison. Two were convicted of murder. Three received sentences having life máximums. I could not hold that such detainees would pose "no risk to the security” of the jail and that their appearance at trial could "be assured without such rigorous restraint”. It is not enough to argue that there are, or might be, a "large number” of other detainees for whom such security is not required. Plaintiffs produced no such witnesses before this court. The evidence in fact suggests that few, if any, unsentenced minimum-risk females were even in custody. (See [HH], [JJ], [KK], [MM], supra.)
On the other hand, the court does find that maximum security is generally not required for convicted (misdemeanant) members of the plaintiff class. However, I am aware of no constitutional prohibition against holding convicted prisoners in maximum security.
In this court’s view, mandating a classification system as demanded by plaintiffs would, in effect, require defendants to exercise the combined judgments of committing Magistrates, trial jurors and presentence investigators. I find nothing in the Constitution to authorize or justify such interference with custodial administration on the facts of the present case. The Constitution does not compel an ideal system of prisoner incarceration. (See [N], supra.)
(v) Lack of Outdoor Exercise or Recreation
There are no provisions for outdoor exercise or outside recreation for any prisoner confined in the Monroe County Jail. The gymnasium is located on the roof level of the jail. The court judicially notes, from personal knowledge and a tour of the facilities, that the gymnasium roof has windows which open to the sky and the air, but those are opened only during the summer. The defendant Sheriff, William Lombard, admitted characterizing as "inhumane” the unavailability of an outdoor recreation area for sentenced prisoners. Mr Nagel testified concerning the psychological disadvantages of constant indoor confinement and to observations of "improved stimulation response” among inmates in institutions where *357 outside recreation was available. The State Commission’s minimum standards provide as follows:
"Prisoners shall be permitted an outdoor ground level or a roof exercise area only when direct supervision is provided;” (9 NYCRR 7003.1 [o])
"If at all possible, some avenues should be made available to prisoners to help them maintain good physical condition. Again it is emphasized that space, supervision and inmate interest are the deciding factors in the scope of such a program.” (9 NYCRR 7103.1 [a] [3]).
The leading case concerning outdoor exercise and the Constitution is generally considered to be Sinclair v Henderson (331 F Supp 1123, 1131), where the court, dealing with a plaintiff who had been in solitary confinement on "death row” for nearly five years, stated that: "Confinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.”
The same holding has been extended to cover inmates generally housed in State prisons. (See, e.g., Nadeau v Helgemoe, 423 F Supp 1250, 1269; Spain v Procunier, 408 F Supp 534, 547; Pugh v Locke, 406 F Supp 318, 332, supra.) That is certainly not surprising. Civilized society has come a long way since the times of Edmond Dantes and Alfred Dreyfus.
To support their claims of constitutional deprivation respecting this issue, plaintiffs point to still other District Courts which have extended and applied Sinclair (supra) to county detention facilities housing prisoners for shorter stays. (See, e.g., Rhem v Malcolm, 371 F Supp 594, 626-627, affd 507 F2d 333, supra; Miller v Carson, 392 F Supp 515, 520-521, and 401 F Supp 835, 891-893 [quoting and following Rhem]; cf. Jones v Wittenberg, 330 F Supp 707, 717, affd 456 F2d 854, supra; see, also, Smith v Sullivan, 553 F2d 373, where a District Court had directed that an outdoor area be provided by the El Paso County Jail for "exercise for rehabilitation,” and the Circuit Court found it unnecessary to decide whether the order was required under the Eighth Amendment, since the Texas Jail Commission had subsequently adopted rules mandating at least some outdoor activity for inmates confined longer than 30 days.)
In this court’s view, the latter extensions and applications of Sinclair are unwarranted and serve only to diminish the role *358 and value of the Constitution. Courts finding "cruel and unusual punishment” as a matter of law, where local detention facilities have no provision for outdoor exercise appear to have overlooked or disregarded the facts in Sinclair which led to that court’s holding. Especially pertinent is the court’s statement that: "The inmates who testified in this case have been living under this condition ["death row” solitary confinement] for as long as 9 years. Some who did not testify have been there longer than that.” (Sinclair v Henderson, supra, p 1129.)
There was no evidence before this court that the health or physical well-being of any plaintiff was adversely affected, or might be so affected, by the lack of outdoor exercise or recreation at the Monroe County Jail. Certainly, the opportunity to be outdoors frequently would be beneficial to the inmates. Mr. Nagel stressed how young people have much excess energy to burn and how permitting them to do so in an outdoor area would lessen tensions and benefit the security of the facility. But it must be remembered that the issues before the court in this lawsuit are constitutional, not sociological. I cannot find an Eighth Amendment violation on the facts of the present case. (See [KK], [LL], [OO], [PP], supra.)
To the extent that the evidence may have shown the availability of outdoor recreation at other facilities in New York State, the court also rejects any equal protection claims, for the reasons previously stated herein under issue (e).
attorneys’ fees
Effective October 19, 1976, Congress amended section 1988 of the United States Code to provide that in section 1983 actions (and other civil rights lawsuits) the court, in its discretion, may award the prevailing party (other than the United States) a reasonable attorney’s fee "as part of the costs”. The 1976 amendment has been held retroactive to cases still in litigation, even on appeal. (Finney v Hutto, 548 F2d 740.) CPLR 909 provides, for class actions, that if "a judgment * * * is rendered in favor of the class”, the court, in its discretion, may award reasonable attorneys’ fees and, "if justice requires,” allow recovery thereof from "the opponent of the class”. In the exercise of its discretion, this court believes that it would be inequitable to award any attorneys’ fees in the present action.
A. Denial of Attorneys’ Fees to Plaintiffs’ Counsel
*359 In exercising its discretion not to award attorneys’ fees to plaintiffs’ counsel, the court considered many factors, among which are the following:
(1) The court is awarding no such fees to defendants’ counsel, even though defendants were the prevailing parties in the action tried to this court (on all issues as to legal liability, and on the preponderance of issues as to equitable relief);
(2) (The "American rule”). In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney’s fee from the loser. (Alyeska Pipeline Co. v Wilderness Soc., 421 US 240, 247);
(3) Under the "common benefit” exception to the "American rule,” it is at least doubtful that the services of plaintiffs’ counsel have benefited a large proportion of the citizens of Monroe County. (See Wright v Southeast Alabama Gas Dist., 376 F Supp 780, 784; see, also, Incarcerated Men of Allen County Jail v Fair, 507 F2d 281, 285, n 2);
(4) The court has found no evidence of "bad faith” (cf. Bond v Stanton, 528 F2d 688) or "obdurate obstinacy” (see Wright v Southeast Alabama Gas Dist., supra) on the part of either defendant herein;
(5) The court judicially notes that plaintiffs’ attorneys are taxpayer-supported, presently funded by a tax-exempt Federal corporation (The Legal Services Corporation). (See Matter of Monroe County Legal Assistance Corp. v Sullivan County Bar Assn., 47 AD2d 606, revd 38 NY2d 540; Matter of Ostrander v Wyman, 41 AD2d 580, mot for lv to app den 31 NY2d 647; US Code, tit 42, § 2996 et seq.). There is persuasive authority that counsel fees to publicly funded nonprofit law firms, if awarded, should be at the same rate as that for similar services provided by privately retained counsel. (See Torres v Sachs, 538 F2d 10.) The court feels that such an award here would effectively make the present litigation a "fee-generating” case. (Cf. Atamanuk v Kwok Yuin Wong, 82 Misc 2d 1059, 1063.) Congress has generally provided that Legal Services Corporation funds may not be used to provide legal assistance in "fee-generating” cases. (See US Code, tit 42, § 2996f, subd [b], par [1].) The court also notes Congress’ intent to restrict the bringing of affirmative class action suits with Legal Services Corporation funds (US Code, tit 42, § 2996e, subd [d], par [5]) and that such funds not be used to solicit a group with respect to matters of general concern to a broad class of persons, as *360 distinguished from acting on behalf of a particular client (US Code, tit 42, § 2996f, subd [a], par [5], cl [A]);
(6) The court also believes it would be inequitable to require the present defendants to pay plaintiffs’ attorneys’ fees, where no legal liability has been found as against either defendant.
"The growing body of correctional law with its internal inconsistencies poses major problems for correctional administrators. Under the Civil Rights Act of 1871, they are personally liable for failure to respect inmate rights, yet few of them have the legal training or legal assistance to keep them abreast of judicial decisions delineating those rights.” (Carlson, p 645 [see Appendix, infra].)
B. Denial of Attorneys’ Fees to Defendants’ Counsel
Assuming that the plaintiffs are "eligible clients” under section 2996a (subd [3]) of the title 42 of the United States Code, they are financially unable to afford to pay for legal assistance. Under those circumstances, it would be most inequitable for the court to direct them to pay any fees to defendants’ counsel.
COSTS
Under all of the circumstances, and for generally the same reasons attorneys’ fees were not awarded, the court determines that it would not be equitable to award costs to any party herein. (See CPLR 8101, 8103, 8108.)
Conclusion
Several of plaintiffs’ allegations were generally justified and were vindicated by relief granted in this action by various Justices of the court (including the undersigned). The "true” defendant, however, is not before the court. That is the County of Monroe, acting through its elected legislators. Through section 5 of article XVII of the New York Constitution, section 217 of the County Law and section 45 of the Correction Law, the State Legislature has devolved upon the County of Monroe the duty and requirement of maintaining the Monroe County Jail under guidelines established by the State Commission of Correction. In carrying out the provisions of the Correction Law, the State Commission is acting as an arm of the State Legislature and in that capacity is possessed of the same powers. (Matter of County of Cayuga v McHugh, 4 NY2d 609, 615.) The ultimate responsibility, therefore, lies *361 with the county and not with the present defendants. As "keeper” of the jail, the Sheriff is charged by law with receiving and housing prisoners committed to his custody (Correction Law, § 500-c). But the defendants can only "keep” prisoners in whatever physical plant, and within whatever budget, is furnished them by the county.
It appears that the major problems revealed in this lawsuit may have resulted, in part at least, from inaction by the County Legislature several years ago. In 1962 the Legislature authorized an overall study of the penitentiary operation, with particular focus on the location and type of structure for a new penitentiary. In 1967 a Citizens’ Advisory Committee (David Boehm, Chairman), appointed by the Legislature, reported and recommended that a new rehabilitation facility, with capacity for 175 inmates, be constructed at once. That recommendation was never acted upon (Croft, pp 4-6 [see Appendix, infra]; see [AA], supra). Another major factor has been an unanticipated explosion in the crime rate during the past ten years. When the cell bed capacity (336) for the main jail was finally selected in 1967, that figure was more than twice as great as the highest daily average prisoner population (152) experienced at the old jail during any of the six preceding years (Croft, p 3 [see Appendix, infra]). A University of Wisconsin study, reported in 1975, has predicted that the prison population of this nation will continue to increase until 1985 and that it may not level off until the end of the century (Carlson, pp 631-632 [see Appendix, infra]).
Plaintiffs may believe that the court could have afforded them some relief, under their State constitutional claims, if the County of Monroe and/or the County Manager had not been dismissed from the lawsuit (cf. Taylor v Sterrett, 344 F Supp 411, mod 499 F2d 367, cert den 420 US 983, supra). The court does not believe so. Section 1983 is a vehicle statute. So also are statutes like sections 41, 51 and 79-c of the (New York) Civil Rights Law. But plaintiffs apprised the court of no vehicle statute which would assist them here under New York law. Nor did plaintiffs attempt to plead under CPLR article 63 or article 78. Courts in New York have no injunctive power beyond that given to them by statute. (Maspeth Branch Realty v Waldbaum, Inc., 19 AD2d 833; Schoeman v Consolidated Edison Co. of N. Y., 66 Misc 2d 784.) Armed with the present decision, plaintiffs may be able, if they find it necessary, to fashion some further relief to meet their needs.
*362 The defendants’ statutory mandates to receive and to keep prisoners lawfully committed to their custody are not necessarily irreconcilable with the directives of this court. Other courts have faced this particular "problem” in various ways. (See, e.g., Costello v Wainwright, 397 F Supp 20, affd 525 F2d 1239, vacated 539 F2d 547, revd 430 US 325; Jones v Wittenberg, 357 F Supp 696, supra; Valvano v Malcolm, 18 Crim L Rep-2394, supra.) Defendants’ attention is also directed to section 657 of the County Law and section 504 of the Correction Law. If necessary legislative assistance is not forthcoming, and if defendants find it necessary to release prisoners to comply with this court’s directions, they are hereby directed to attach release "priority” to those inmates held for the longest time under the lowest bail (cf. Valvano v Malcolm, supra). However, if such release of prisoners' becomes necessary, the court will defer to any alternative method or priority of release which may hereafter be established by the State Commission of Correction.
This court’s orders necessitating any such release may be ” considered equivalent to those of a court sustaining a writ of habeas corpus. In legal contemplation they are the same, in any event. Defendants’ statutory duty is simply that no person lawfully committed shall be let out of the jail "without lawful authority” (Correction Law, § 500-c).
The operation of the Monroe County Jail is, of course, also subject to directives and sanctions of other lawful authorities. No order or action of this court is intended to conflict with, or to extend to defendants any rights beyond those which might be further limited by, the lawful action of any proper authority.
In the evidence, in their posttrial brief and in a proposed final order submitted to the court, plaintiffs raised various other issues not dealt with in this decision. The court chose not to deal with them either because they were not pleaded or because the court deemed them to be insubstantial and not of constitutional magnitude.
APPENDIX
References in the court’s decision to the sources below represent matters judicially noticed. (See CPLR 4511 [d]; 31 CJS, Evidence, § 33 [7], p 955; Barnett v Rodgers, 410 F2d 995, 1002, n 24; [K], supra.)
*363 ABA Survey: Survey and Handbook on State Standards and Inspection Legislation for Jails and Juvenile Detention Facilities; American Bar Association, Commission on Correctional Facilities and Services; 3d ed. [1974]
Carlson: Corrections in the United States Today: A Balance Has Been Struck; Norman A. Carlson, Director of the Federal Bureau of Prisons; 13 Amer Crim L Rev 615 et seq.
Croft: The Monroe County Jail: The Need for and Feasibility of Relocating into Other Facilities Seven Categories of Prisoners; Elizabeth Benz Croft, Roberta Cronin and Carlisle H. Dickson; Rochester-Monroe County Criminal Justice Pilot City Program; University of Rochester, Graduate School of Management; 119 pp; [1975]
Meyer: Constitutionality of Pretrial Detention, Hermáne Herta Meyer; 60 Georgetown LJ 1382 et seq.
Moyer: Guidelines for the Planning and Design of Regional and Community Correctional Centers for Adults; Fred D. Moyer, Project Director; Department of Architecture, University of Illinois; [1971]
Walsh: Report of Inspection of the Monroe County Jail, January 18-19, 1972; David W. Walsh, Inspector, State Commission of Correction; 8 pp.
Wasser: Letter to the Court, June 23, 1977, from Joseph Wasser, Commissioner, State Commission of Correction.
Yale: Constitutional Limitations on the Conditions of Pretrial Detention; 79 Yale LJ 941 et seq.